# EXHIBIT B

## COURT OF COMMON PLEAS BUCKS COUNTY

## PENNSYLVANIA

**Wallace T. Preitz II**

              Plaintiff, Pro Se

       v.

**Allied Pilots Association,**

             Defendants.

## <u>PLAINTIFF'S COMPLAINT</u>

PLANTIFF DEMANDS TRIAL BY JURY

Wallace T. Preitz II (Pro Se)
<u>Mailing Address:</u>
120 Suffield Court
Chalfont, PA 18914
(215)796-2499

# COMPLAINT

Plaintiff, *pro se*, brings this action against defendant based upon defendant's, breach of the Collective Bargaining Agreement (CBA), breach of duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 (1976) et seq, (LMRDA) Civil Enforcement of Union Bill of Rights, 29 U.S.C. 411-412.

## Preliminary Statement

United States military officers are taught an honor code which is instilled in cadets at military academies, ROTC universities, Officer Training Schools, and institutions such as the Citadel. The honor code states: "I will not lie, cheat, steal or tolerate those who do."

Preitz strives to hold the Allied Pilots Association (APA) accountable for their past poor actions against their own disabled pilots. Preitz brings this action against APA for the Defendant's breach of duty of fair representation owed to him and other similarly situated pilots in relation to the APA Equity Distribution Allocation and Award, for not upholding and defending the provisions of the CBA in relation to terminations of disabled pilots (possible ADA violation), for not protecting the seniority rights of disabled pilots prior to October 2016, and for violations of (LMRDA) Civil Enforcement of Union Bill of Rights, 29 U.S.C. 411—412.

American Airlines declared bankruptcy in November 2011and emerged from such in December 2013. As part of the bankruptcy restructuring the new American Airlines gave American Airlines pilots a 13.5% "Equity Stake" in the post-bankruptcy company. The equity stake was estimated to be worth approximately 1.2 billion dollars. American permitted APA to distribute the equity shares among its pilot members conditional upon APA's indemnification of American for any legal challenges brought by any pilot or group of pilots. The distribution of the equity shares was done via a process known as Equity Distribution. This portion of the claim is based upon APA's arbitrary, discriminatory and bad faith treatment of Plaintiff and other similarly

situated disabled pilots during the APA Equity Distribution (ED).  Other similarly situated disabled pilots were awarded equity shares worth an estimated $110,000 to $160,000.  Preitz and other similarly situated pilots received much less.  In some cases over $100,000 less.

APA has been complicit and complacent concerning American Airlines termination of disabled pilots who have been removed from the seniority list for being on inactive status, unpaid sick, or disability for more than five years (APA refers to these pilots as "Medically Disabled Dropped" or MDD).  These terminations are in direct violation of any provision of the collective bargaining agreement (CBA) and a probable violation of the American with Disabilities Act (ADA).

Emerging from bankruptcy the new American Airlines was a merger of the previous American Airlines and U.S. Airways.  The merger created a pilot seniority integration process that lasted years and was conducted by a panel of arbitrators.  September 2016 the arbitrator's award was made public and included the Integrated Seniority List (ISL).  The ISL included 11 MDD disabled pilots and excluded approximately 300 similarly situated MDD disabled pilots. Immediately after, October 2016, the APA signed a letter of agreement (LOA) with American Airlines.  The LOA states that **after** October 2016 MDD pilots will no longer be removed from the seniority list for being on inactive status, unpaid sick, or disability for more than five years. This LOA protects future MDD pilots from being removed from the seniority list and fraudulently terminated by American Airlines; the LOA protects the ability of MDD pilots to return to work and their future financial wellbeing. While an admirable achievement the APA neglected to protect 250 to 300 other MDD pilots who were terminated by American Airlines in the approximate time frame of 2006 to 2016.  Prior to 2006 American Airlines had never terminated a disabled pilot or their long term disabilities.  This neglect created a "dough nut hole" and left the future career aspirations, and financial wellbeing, of hundreds of MDD pilots in jeopardy.  Preitz contends that both seniority actions, absence of 300 MDD pilots from the ISL

and creation of a "dough nut hole', are discriminatory acts and a violation of APA's duty to fairly represent all disabled pilot members and a possible ADA violation.

The Equity Distribution process concluded in November 2013 with Arbitrator Goldberg's Decision and Award.  The 10 month Equity Distribution was a very adversarial process between APA and MDD pilots.  A few MDD pilots prevailed in their ED challenges and won substantial payouts for themselves and similarly situated MDD pilots as a class.  APA's Equity Distribution Post Hearing Brief stated that such a payout would "reduced the payout" to other APA pilot members (SOF 37).  APA has a union website known as "Challenge and Response" (C&R). C&R is a virtual union meeting hall where pilots can share information back and forth with the 15,000 pilot members of APA.  It's the most expeditious, cost effective, and direct form of commination a single APA member can have with the entire 15,000 pilot **membership**. Other forms of APA communication limit contact to specific members/National Officers/Board of Directors and are not time or cost effective.  MDD pilots have had access to C&R since its creation approximately 20 years ago (approximately early 1994) and were able to post and discuss topics.  During and following the ED process a few MDD pilots posted information concerning APA's treatment of disabled pilots and backed their positions with facts.  April 2014, shortly after the ED process concluded and APA had lost to MDD pilots, the APA locked out all MDD pilots (approximately 300) from C&R.  Preitz represents that APA's actions are in violation of the Labor Management Reporting and Disclosure Act (LMRDA) and occurred at a very critical time when the seniority list integration process was proceeding and the MDD pilot's seniority was in jeopardy.  MDD pilots were left without a critical pipeline of communication, Challenge and Response. One pilot's C&R LMRDA claim, prevailed in January 2017 in the Southern District of Florida (Kathy E. Emery v Allied Pilots Association, CASE NO. 14-80518-CIV-HURLEY). Judge Hurley found that the individual APA Board of Director's motivation for bringing the topic of MDD pilots, on C&R, to the Board of Directors was motivated by his desire

to silence a group he viewed as combative and litigious. The MDD pilots were left with no voice and completely in the dark from April 2014 till January 2017.

## PARTIES

1.      Plaintiff, Wallace T. Preitz, II ("Preitz") is an adult individual who resides at 120 Suffield Court, Chalfont, PA 18914.

2.      At all times relevant, Preitz was and is a member in good standing of the Allied Pilots Association, and a pilot who is covered under the Collective Bargaining Agreement ("CBA") between American Airlines, Inc. ("American" or "AA" or "the Company"), and the Allied Pilots Association.

3.      Defendant, Allied Pilots Association ("APA" or "Union"), is a labor organization, and an unincorporated association headquartered in Texas, with a domicile and members in Pennsylvania. APA is the "representative" of the 15,000 pilots of American Airlines and is entitled to act for, and negotiate, collective bargaining agreements covering pilots in the bargaining unit. APA National Officers consist of three elected positions (President, Vice-President, and Secretary Treasurer). The APA Board of Directors (BOD) is APA's supreme policy making body. The BOD is made up of 22 Directors, one Chairman and one Vice Chairman elected from each of the APA's eleven domiciles, pilot bases at major airports from which American operates in the United States.

## Jurisdiction and Venue

4.      Venue is proper in Bucks County Court as the breaches took place and members can be found in this county.

## Statement of Facts (SOF)

5.      On June 3, 1992 Preitz became employed with American.

6.      On a date uncertain, but shortly thereafter, Preitz became a member of APA and remained, and still remains, a member in good standing.

7.    From June, 1992 through July 2005, he successfully performed his duties as a
commercial pilot.

8.    In or around July 3, 2005 Prietz applied, and was approved, for American long term
disability (LTD) benefits due to a medical situation which rendered him ineligible for a Federal
Aviation Administration (FAA) First Class Medical Certificate.

9.    American's financial crisis started around 2001 and ended with a 2011 bankruptcy filing.
In the long history of American Airlines the company **had never terminated** pilot disability
benefits.  Around 2006/2007 many LTD pilots had their LTD benefits arbitrarily and
capriciously terminated. American had developed a cost savings scheme to cut their long term
disability obligations, this scheme has been the focus of OSHA complaints, Sarbanes-Oxley Act
filings and  multiple ERISA lawsuits across the nation including: (Robert T. Miller v American
Airlines, Inc., Civil Action No. 08-cv-0277 US District Court for the Middle District of
Pennsylvania).  AA contracted a third party medical reviewer "Western Medical Evaluators"
(WME).  WME was to perform independent medical reviews of pilots who contested AA's
termination of their LTD benefits; WME was not properly vetted by American or the APA.
WME (on whose reports AA relied to terminate my benefits) and its principals were indicted by
the State of Texas in August, 2010, for securing execution of documents by deception in
connection with workers compensation claims during the precise time frame in 2007 and 2008
that they were performing services for AA.  WME and its principals have also been accused in
WME employee affidavits, filed in Capital Funding Solutions, Inc., v WME (Case No. 08-cv-
61101-PAS) litigation in the United States District Court for the Southern District of Florida, of
sending out forged or fraudulent reports on doctors' behalf.  This is exactly what my ERISA case
alleges because conclusions contained in the WME report are not supported by, but rather are
inconsistent with, the medical information in my claim file.  Moreover, no representative of
WME ever examined me.  WME principals were later convicted, incarcerated and given
substantial financial penalties.  Approximately 20 American pilots were impacted by WME
reviews while approximately 100 were caught in Americans "Nurse Case Management Savings"
scheme.

10.    On November 12, 2007 American terminated Prietz's LTD benefits without warning and despite the fact that there were no changes in his condition or medication.

11.    In October 2008 APA originally supported disabled pilots by hiring Daniel Fienberg of Lewis, Feinberg, Lee, Renaker, and Jackson, P.C.   Feinberg, a top national ERISA attorney, was hired to stem American's newly hatched cost savings assault on LTD pilots, the "Pilot Disability Nurse Case Management Savings" scheme.

12.  Later APA abruptly and completely reversed their support, fired Feinberg, abandoned disabled pilots, told them to defend themselves at their own expense, offered little to no help for their individual suits, did not respond to requests for information, and essentially cutoff communication.  The APA mentality had drastically changed; the disabled were left under the bus.  APA had no interest in defending disabled pilots during AA's financial crisis which ended in a 2011 bankruptcy filing.  Essentially the APA was not going to negotiate items for the disabled at the expense of the actively flying pilots, the disabled were deemed to be expensive, non-dues paying, and non-contributing members.

13.    On or around November 2010, Preitz filed an ERISA action seeking, *inter alia*, reinstatement of AA Long Term Disability (LTD) benefits and ***reinstatement to the seniority list***.  An ERISA lawsuit was the only remedy available to Preitz.  Preitz has endured a substantial financial burden since 2007 till present.  During the 2013 Equity Distribution process Arbitrator Goldberg ruled, for Equity Distribution purposes, a lawsuit was the functional equivalent of a union grievance.  It should be remembered that an APA grievance could not reinstate LTD benefits and was not the procedure as outlined in "American Airlines Pilot Long Term Disability Plan" of February 2004.  Preitz's ERISA lawsuit was removed to the United States District Court for the Eastern District of Pennsylvania and assigned Civil Action No. 2:11-cv-0044 CDJ.  The case settled out of court but has not been executed or fulfilled.

14.    On or around June 1, 2010, Preitz was removed from the seniority list for being on inactive status, unpaid sick, or disability for more than five years.  American never informed Preitz that his employment had been terminated; therefore there was no basis for an APA grievance to be filed.  It seems by design and with full cooperation between American and APA that these violations of the CBA and American with Disabilities Act (ADA) occurred.  A few possible reasons are: (1) it avoids mass union grievances by not notifying  a pilot of employment termination,  (2) APA and AA know that such terminations are in violation of any provision of the CBA and a violation of the ADA, (3) it avoids legal action against the APA and American for violation of the Collective Bargaining Agreement ("CBA", Section ll. D. and Supplement F(1)), and it's a violation of the duty of fair representation.  It should be noted that a pilot terminated for exceeding five years is not notified of such termination by either AA or the APA, this lack of notification is part of the multiple grievances: Dallas (DFW12-012) and LaGuardia (LGA 11-054) which read:

> ",*for failing to provide pilots notice of termination* prior to ***terminating employment status*** of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

It should be noted that these grievances have not been moved forward by the APA.  The DFW 12-012 grievance is over 5 years old and it simply collects dust.   Many inquiries to AA, from multiple pilots, concerning these terminations results in no clear or straight answer or written documentation of termination or what provision of the CBA allows such actions.  This non-notification is also a violation of CBA Section 13 D and Section 24 (I) which requires American to notify a pilot of a change in status.  Jim Anderson is Americans Director of Crew Qualifications and stated his duties as administering the pilot collective bargaining agreement (CBA).  Anderson agreed that CBA Section 24 requires that a change in pilot status shall be done so in writing.  Concerning terminations Anderson stated:

> "No. The term termination, I don't use the term termination when removing somebody off the seniority list after five years.  That's just a practice that we do.  It's not a termination to me, it's just removal from the seniority list."

One can easily see why a pilot would be so confused concerning their employment status. American and APA dance around the subject of "administrative termination" of disabled pilots. A disabled MDD pilot who is removed from the seniority list after five years of disability and later regains his FAA First Class Medical Certification can petition the APA and American to return to work. Prior to 2010 the vast majority of such pilots, if not all, have returned to work. Since approximately 2010 a few pilots have returned and others have not? As will be shown in pages to come, American has used this return to work provision in a manipulative and punitive manner and with APA's compliance.

15.    Scott Hansen's, AA Director Flight Administration, declaration of June 29, 2016 clearly states that pilots terminated for cause are notified by AA of such terminations while "In contrast, American's routine business practice prior to 2013-2014 was not to provide notice of APA or a pilot when a pilot [MDD pilots] drops off the seniority list under Section 11 (D)(1) or Supplement F of the CBA, …" Hansen is referring to disabled MDD pilots dropping off the seniority list and is specifically stating that pilots are dropped per Section 11 (D)(1) or Supplement F (1); yet Hansen does not, and cannot, provide and reference to a section of the CBA that allows termination of disabled pilots.

16.    From June 2010 till January 2013 Preitz was covered under his wife's medical benefits. Due to a divorce Preitz lost his medical benefits in mid-January 2013.

17.    On or around February 18, 2013 Preitz contacted the APA's third party administrator (WEB-TPA) for possible enrollment into APA's Catastrophic Major Medical Benefit Plan. This was a free benefit offered to a select group of pilots based on APA eligibility criteria. Preitz's only applicable enrollment category is Terminated Awaiting Grievance ("TAG").

18.    WEB-TBA queried APA Benefits multiple times concerning Preitz' status. On or around March 19, 2013 WEB-TPA received confirmation of "TAG" (Terminated Awaiting Grievance) and enrolled Preitz into the APA Catastrophic Major Medical Benefit Plan.

19.    Medically Disabled Dropped (MDD) pilots are not eligible for APA emergency medical benefits (Catastrophic Major Medical).  TAG pilots are eligible for APA emergency medical benefits.

20.    Medically Disabled Dropped (MDD) is APA's three letter identifier for AA Long Term Disability (LTD) pilots who were on long-term disability benefits for more than five years and removed from the seniority list per Section 11. D. 1 and Supplement F(1) 5. (d) of the Collective Bargaining Agreement (CBA). **These sections of the CBA call for seniority to cease to accrue, there is no provision for termination nor is there any provision to loose seniority.**

21.    American refers to such MDD pilots with American's internal code of "MDSB":

"If a pilot had been on disability for more than five years, American would assign the pilot an AA Status of MDSB and APA would assign the pilot an APA status of MDD."

22.    APA past President Keith Wilson's signed declaration of March 8, 2016 states:
"Once a pilot reaches five years of disability leave (assuming APA and American extended the period from three to five years), the pilot no longer retains or accrues seniority, *Id.* And once such pilot drops off the seniority list by operation of Section 11(D) (1), his or her employment terminates under Section 1(C) (1)."

This is the only time that an APA National Officer has specifically named the section of the CBA that, in his interpretation, permits termination of disabled pilots.  Dating back to 2007 the APA has refused to specify what section of the CBA allowed such terminations.

23.    CBA Section 1(C) (1) is entitled "Recognition and Scope".  Scope concerns, *inter alia,* commuter code sharing, domestic and international air carrier code sharing, excess baggage, Fixed Based Operators, Livery (air carrier's name, logo, paint scheme, etc…).  Scope simply does not concern the termination of disabled pilots.

24.     Capt. Keith Wilson's last day as APA President was June 30, 2016.  On that day Wilson
wrote a "Presidential Constitutional Interpretation" in regards to the membership status of MDD
pilots.  His interpretation was never provided to the MDD pilots or the membership in general, it
was only made public during a recent, 28 November 2016, four day court trial in the Southern
District of Florida (Emery v APA).  During and since the 2013 ED proceedings the APA took the
position that MDD pilots **were not** APA members and not covered under the CBA.  On his last
day in office President Wilson made an interpretation that MDD pilots were inactive members of
the APA.  When advantageous to APA, APA has flipped flopped and stated MDD pilots were, or
were not, APA members.  Lawrence Meadows v APA, in the state of Utah is one such example.

Wilson's "Presidential Constitutional Interpretation" is important for another reason.  Dallas
Grievance 12-012 (SOF 60, 61, 62, 63, 64, 65, 66, 66, 67, 77)  has laid unheard for 5 years and
not been grieved before a System Board of Adjustment which is a proper venue under CBA
Section 23 "System Board of Adjustment" (SOF 63).  Yet Wilson's "Presidential Constitutional
Interpretation" interprets the exact same sections of the CBA (Section 11 D. and Supplement
F(1)) that are set forth in Dallas Grievance 12-012.  His interpretations have been extremely
detrimental to MDD pilots and are in violation of the CBA and a probable violation of the ADA.

25.     During ED hearings Preitz testified that he was told multiple times by APA lawyers that
he was considered TAG because Preitz's ERISA suit was the functional equivalent of a union
grievance and that a grievance was not the proper venue to reinstate terminated LTD benefits.
Preitz's testimony and letters concerning this went uncontested by APA.  APA produced no
witnesses to contest Preitz's testimony.


## Equity Distribution Eligibility and Allocation


26.     APA commenced the ED process in or around March 2013 which essentially consisted
of: (1) challenges due in May 2013, (2) motion to dismiss hearing, (3) merits hearings, (4) post
hearing briefs, (5) Decision and Award, and (6) clarification period ending in November 2013.

27.    ED Funds were allocated to pilots based on a methodology developed by the APA Board of Directors and set forth in the "APA Board of Directors - Approved Eligibility and Allocation" pamphlet of April 3, 2013.  The Board of Directors developed four "silos" each with a different percentage of the total funds: (1) Pension Calculation Silo (30%), (2) Career Progression/Inverse Seniority Silo (30%), (3) Benefits/Quality of Work Life Per Capita Silo (20%), and (4) Compensation/Lump Sum/Retiree Medical Years of Service Silo (20%).  Because each pilot's circumstances were different, each pilot's individual award from each of the four silos was unique.  The APA internal dispute resolution procedure was set up for pilots to "challenge" the APA Board of Directors methodology.

28.    Preitz was not informed of the ED procedural hearings by APA nor initially allowed on the ED website.  Preitz was informed by other Medically Disabled Dropped (MDD) pilots.

29.    Preitz was initially excluded from any ED silos and therefore was set to receive zero funds.  APA took the position that Preitz did not meet the eligibility requirements as set forth in the published "APA Board of Directors - Approved Eligibility and Allocation", April 3, 2013.

30.    APA's Eligibility and Allocation extended full four silo Equity Distribution funds to furloughed pilots:

> "there are approximately 94 pilots who began training at American Airlines **but did not complete initial training**.  Per a special re-employment agreement, these pilots have AA seniority numbers **and will be treated the same as other furloughed pilots**.  Pilots returning from furlough during the SQP must sign an enforcement letter and promissory note agreeing to complete flight training, fly at least one revenue flight if required to be placed on active status, and remain at AA in active status for at least 12 months after returning from furlough or else that pilot will owe APA an amount equal to all or a portion of their distribution."

31.     Furloughed pilots who never completed training or flew one aircraft for American were set to receive the full four silos for promising to return and work for only one year.  MDD disabled pilots with extensive careers at American were set to receive zero, one or two silos.

32.     For ED purposes APA had essentially split the MDD pilots into two classes: (1) MDD pilots currently receiving AA LTD benefits, and (2) MDD pilots whose LTD benefits had been terminated by AA's "Pilot Disability Nurse Case Management Savings" scheme.

33.     The first group of MDD pilots, currently receiving American Airlines Long Term Disability benefits (AA LTD), were:  (1) terminated by AA against all provisions of the Collective Bargaining Agreement (CBA), (2) **never** informed by AA or APA of their termination,  (3) currently **receiving** AA LTD benefits, (4) **received** AA medical benefits, (5) **received one or two silos** from APA's Equity Distribution fund, (6) **did not** receive free APA emergency medical benefits, (7) **received** free APA legal services, (8) were intentionally removed and **did not** receive access to APA online virtual union hall "Challenge and Response", and (9) **were** provided duty of fair representation by APA.  APA estimates this group to number approximately 300 pilots.

34.     The second group of MDD pilots were those who had their AA LTD benefits fraudulently terminated by AA's "Pilot Disability Nurse Case Management Savings" scheme, they: (1) were terminated by AA against all provisions of the Collective Bargaining Agreement, (2) **never** informed by AA or APA of their termination, (3)  **received no** AA LTD benefits, (4) **received no** company medical benefits, (5) **received zero** Equity fund silos from APA,  (6) **did not** receive free APA emergency medical benefits, and (7) **did not** receive free APA legal services, (8) were intentionally removed from and **did not** received access to APA online virtual union hall "Challenge and Response", and (9) **were not** provided duty of fair representation by APA.  Essentially these pilots were left on the street with nothing but medical issues and costly ERISA claims against AA.  To the best knowledge of the plaintiff this group numbers approximately 20 pilots, however AA Medical was tracking hundreds of such pilots for elimination and termination and the number could well exceed 20.

35.    A description of TAG pilots will come later, for now it's important to know what TAG pilots received from APA and AA: (1) these TAG pilots were terminated by AA per Section 21 of the CBA, for various disciplinary reasons including substance abuse (drugs and alcohol), (2) these pilots **were informed** by both AA and APA of their termination, (3) **were never** eligible for AA LTD benefits, (4) **received no** company medical benefits, (5) **received full** four silos shares of APA equity funds valued approximately as high as $160,000.00, (6) **received free** APA emergency medical benefits, (7) **received free** APA legal services, and (8) **received access** to APA online virtual union hall "Challenge and Response", and (9) **were** provided duty of fair representation by APA. To the best knowledge of the plaintiff this group numbers approximately 20-25 pilots.

36.    For easy of reference, Statement of Facts (SOF) 33, 34, and 35 are placed in chart form.

| BENEFIT AVAILABLE | APA status code "TAG". Includes disciplinary actions and substance abuse (drugs/alcohol) | APA status code "MDD" receiving AA LTD benefits | APA status code "MDD" <u>not</u> receiving AA LTD benefits |
|---|---|---|---|
| **Receiving AA LTD benefits?** | Not applicable | YES | NO |
| **Terminated by AA?** | YES | YES | YES |
| **Informed by AA and APA of their termination** | YES | NO | NO |
| **Terminated within the provisions of the CBA?** | YES | NO | NO |
| **Receiving AA medical benefits?** | NO | YES | NO |
| **Amount of APA Equity funds receiving?** | FULL AMOUNT (four silos) | Partial amount (one or two silos) | ZERO |
| **Receiving APA emergency medical benefits (Catastrophic Major Medical)** | YES | NO | NO |

| | | | |
|---|---|---|---|
| **Receive free APA legal services?** | YES | YES | NO |
| **Access to APA's virtual town hall "Challenge & Response"?** | YES | NO | NO |
| **Receive APA Duty of Fair Representation?** | YES | YES | NO |

37.    Approximately 300 MDD pilots were given zero, one or two silos from the Equity Distribution fund, most of these pilots had extensive flying careers with American.  APA's justification for such disparate treatment of the "300" is found in APA's Post Hearing Brief. APA felt that paying the 300:

> "...***would significantly reduce the payouts*** for pilots APA has reasonably determined will be affected by the 2013 CBA concessions by diverting significant resources to those APA has reasonably determined are unlikely to be affected."

## TAG and TAG for "cause"

38.    It's appropriate to discuss the meaning of Terminated Awaiting Grievance (TAG) and TAG for "cause".   Simply put, at the time of the ED proceedings, 2013, all APA written and historical evidence supported a definition of TAG to mean a pilot that was terminated and was awaiting a grievance seeking resolution of that termination.  Nothing stated the termination needed to be for disciplinary reasons.  The Dallas and LaGuardia bases grievances were written to reflect these terminations and clearly state: `", for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."`

39.    During the ED proceedings APA minted their new definition of TAG to **only** include pilots terminated for "cause".   The term "cause" meant the pilot was terminated for disciplinary actions under Section 21 of the CBA:  convicted of criminal offenses, felonies, stealing from the

company, violation of corporate policies, etc... Capt. McDaniels', APA Membership Chairman, declaration of July 8, 2013 states "Terminated Awaiting Grievance, or TAG, is APA's code for pilots who (1) have been terminated for **cause** as a result of the disciplinary process in Section 21 of the CBA between APA and American, and (2) are pursuing reinstatement."

40.    APA could produce no evidence for this new definition of TAG for "cause". APA's only justification was to state that TAG was an internal unwritten term understood to mean for "cause". During a 2013 ED hearing Arbitrator Goldberg stated:

"PROFESSOR GOLDBERG : Mr. Myers [APA attorney], you can ask all the questions you want of all the witnesses you want who will testify, every last one, the internal understanding of TAG is terminated/awaiting—terminated for *cause*, awaiting grievance. That does not change the fact that there is no written documentation on that. The external documents do not refer to that."

41.    The Arbitrator's Decision and Award ruled he would accept APA's internal definition of TAG to mean for "cause" only. He also ruled that it was arbitrary for the APA to treat "TAG grievance" and "non-TAG grievance" pilots differently for Equity fund eligibility. The Arbitrator required that APA's TAG presumption of success, APA Board of Directors basis for awarding TAG pilots four silos, should be extended to pending non TAG grievances and ERISA lawsuits. **For ED purposes Non-TAG grievances and ERISA suits would have the presumption of success.**

42.    By the APA adding "cause" into the definition of TAG, and the Arbitrator accepting that definition, the APA could now justify not paying over 300 MDD pilots a full four shares of the Equity Distribution funds. By accepting APA's newly minted "cause" definition the Arbitrator rendered mute the Dallas and LaGuardia base grievances which would have entitled all MDD pilots to a presumption of success and four full silos. The equity distribution that was meant to be inclusive was now exclusive of: (1) numerous MDD pilots who had their LTD benefits fraudulently terminated by AA and therefore were receiving zero ED funds, and (2)

approximately 300 MDD pilots who were given one or two ED silos only.  The value of excluding these MDD pilots falls between **$15,000,000.00 to 30,000,000.00.**

43.    During ED proceedings, July 2013, APA further expanded the TAG for "cause" definition to include substance abuse (drugs and alcohol).  Capt. McDaniels', chairman of the APA Membership Committee, stated:

> "To have TAG status, a pilot must either have a pending grievance that would result in his or her reinstatement if the pilot were to prevail *or be participating in a program, such as a substance abuse program* [**FAA HIMS program**]*, that, if successful, would result in the pilot's reinstatement.*"

44.    According to APA's ED Eligibility and Allocation a TAG pilot is:

> "A pilot who has been terminated by the Company [American Airlines] as of Jan. 1, 2013 but has not yet completed the grievance process *will be considered an active pilot for this distribution.*"

An "active pilot" for ED purposes is a pilot who will receive a full four silos of Equity funds valued as high as $160,000.00.

45.    The FAA's Human Intervention Motivation Study (HIMS) program is the FAA's method of returning pilots, with drug/alcohol abuse issues, to work upon successful completion of the program.

46.    APA's long term disability program provides benefits for those inflicted with substance abuse issues "chemical dependency", this is a clear acknowledgement that APA considers these issues to be physical in nature.

47.    For Equity Distribution fund purposes APA draws a line in the sand and selectively advocates four ED silos for a small class of physically inflicted pilots, the TAG pilots with drugs/alcohol dependency.  Simultaneously APA ignores a much larger class of pilots inflected

with a wide spectrum of other physical issues, these MDD pilots received zero, one or two ED silos.

48.    APA's justification for supporting TAG pilots was clearly summarized by Captain Mellurski (ED Chairman, prior Board of Director, and Negotiating Committee Chairman) during the ED proceedings:

> "When it came to LTD pilots, there were differences between LTD pilots and TAG pilots. *__The TAG pilots were out on the street with nothing, no benefit.__* There was nothing in the contract that gave them anything while they were out on the street. So a TAG pilot who is out for seven years got nothing. *__An LTD pilot got the benefits from the company that were__* negotiated in the *__contract and got the benefits from the APA that we were able to keep in place simply because we chose to do that.__*"

Captain Mellurski's statement totally neglects the MDD pilots who had their LTD benefits terminated under AA's "Pilot Disability Nurse Case Management Savings" cost savings scheme. As the chart above (see SOF 36) clearly shows, these pilots were out on the street with nothing, both AA and APA completely abandoned this group of disabled pilots.

49.    The previous chart (see SOF 36) clearly shows APA supporting TAG pilots inflicted with alcohol and drug abuse.  The chart also shows APA completely abandoning MDD pilots, disabled for a wide range of medical issues and whose LTD benefits have been fraudulently terminated by American Airlines cost savings scheme.  APA stated that their rational for supporting TAG pilots over non-TAG pilots (included are MDD pilots) was based on APA's assertion that "a substantial portion of pilots on TAG have been reinstated [employment and seniority reinstatement]." This assertion the Arbitrator found to be baseless: "... it [APA's assertion that a substantial portion of pilots on TAG have been reinstated] *is wholly unsupported by the evidence in the record."* To the petitioner the APA's support of one group of medically inflicted pilots (drugs and alcohol) while simultaneously ignoring another much larger group of medical inflicted pilots appears to be patently

unreasonable, irrational, blatantly discriminatory, speaks to the distorted culture at the APA surrounding disabled pilots, and is most likely illegal under the American with Disabilities Act..

## Motion to Dismiss hearings

50.     In 2007 Preitz's LTD benefits had been fraudulently terminated by American.  Preitz exhausted his internal American administrative remedies and ultimately filed an ERISA action. During this process Preitz asked APA legal if a grievance should be filed, APA responded "no". APA also advised Preitz that his status was TAG because his 2011 ERISA suit contested his LTD benefit termination, **sought reinstatement to the seniority list** and was his only applicable remedy.

51.     Preitz filed a timely ED Challenge which included, *inter alia*, claiming TAG status and treatment like other similarly situated pilots.

52.     APA moved to dismiss Preitz' challenges based on: (1) no duty of fair representation because MDD pilots were considered non APA members, (2) not on seniority list, (3) not receiving AA LTD benefits, (4) employment terminated by AA, and (5) not on Terminated Awaiting Grievance (TAG) status.

53.     June 13, 2013, the day of the ED motion to dismiss hearings, WEB-TPA notified Preitz that his Catastrophic Major Medical Benefit Plan was canceled as of June 12, 2013.  This eliminated evidence that Preitz was enrolled under Terminated Awaiting Grievance (TAG), the only enrollment option pertaining to Preitz.  It's apparent that APA lawyers had the WEB-TPA termination letter before Preitz.  Preitz's rebuttal letter of June 19, 2013 was uncontested by the APA or WEB TPA.

54.     APA's motion to dismiss Preitz's challenge was denied by the Arbitrator.  It was obvious the APA owed a Duty of Fair Representation to disabled pilots.

## ED hearings pertaining to Preitz's Seniority Reinstatement

55.    Preitz's ERISA suit seeks both LTD benefit reinstatement and **seniority reinstatement**.

56.    Throughout the ED proceedings Preitz stated that his ERISA suit sought, *inter alia*, reinstatement to the seniority list.

57.    Throughout the ED proceedings the APA acted in bad faith and intentionally misled the Arbitrator to believe that Preitz's ERISA suit sought only LTD benefit reinstatement.  APA intentionally disregarded the seniority reinstatement provision.

58.    Arthur McDaniel's declaration, July 8, 2013, states: `"and neither [Preitz or Emery] has a pending grievance that would result in reinstatement."`  This is a false statement and misleads the Arbitrator to think that Preitz does not have an avenue for seniority reinstatement, when in fact Preitz' ERISA suit seeks that exact remedy.

59.    APA's Post Hearing Brief, July 30, 2013, reads:

> "However, his lawsuit, even if successful, does not and could not seek to return him to active flying; ***it seeks only to reinstate his LTD benefits***."

APA's final briefing was intentionally crafted to distort and misrepresent Preitz's ERISA suit. To restate, Preitz EIRSA suit seeks reinstatement to the seniority list as one of its remedies.

## ED hearings pertaining to the Dallas and LaGuardia base grievances

60.    In part the Dallas base grievance ("Dallas grievance" or "DFW 12-012"), dated May 22, 2012, reads:
"protesting the Company's [American] violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots System Seniority List **and** failing to provide pilots notice of termination prior to

terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

61.     The contractual rational of APA's argument in the Dallas grievance is there is simply **nothing** in the CBA that says that after five years a pilot gets terminated.  During ED proceedings the APA choose to ignore the termination portion of the grievance and concentrated on having a FAA Class I medical in hand and being able to return to active flying, this language is clearly absent from the grievance.

62.     **This cannot be emphasized enough, CBA Section 11. D. 1 and Supplement F(1) do not call for the termination of pilots** "who have been on inactive status, unpaid sick, or disability for more than five years." **The CBA only states that seniority ceases to accrue** which results in removal from the seniority list.  Over the past several years APA has been complicit and complacent concerning American's termination of disabled pilots in violation of any provision of the CBA.   For **5 years** APA has not pursued a resolution to the Dallas grievance.  American's Director of Crew Qualifications, Jim Anderson, administers the CBA for American.  Anderson stated that it's the responsibility of the APA to move a filed grievance forward. This intentional discrimination against disabled pilots is most likely a violation of the American with Disabilities Act (ADA) and a breach of Duty of Fair Representation under the Railway Labor Act.


63.     CBA Section 13 "Seniority" states:


"**B. Seniority Date** Seniority shall begin to accrue from the date a pilot is first assigned to airline flying duty and **shall continue to accrue** during such period of duty **except as provided in Sections 11** and 12 of this Agreement."

"**C. Retention of Seniority** A pilot once having established seniority **shall not lose such seniority except** as provided in this Section**, nor** shall such pilot's **relative position** on the Pilots' System Seniority List **be changed for any reason**, including disciplinary action, **except as provided in paragraph B.** of this Section."

**"D. Basic Seniority Rule** In the event a pilot is considered not to be sufficiently qualified, the Company ***shall promptly furnish*** such pilot written reasons therefore." A reading of the "Hansen Declaration" (SOF 69) demonstrates that American is doing two things: (1) AA is violating Section 13 (D) by not "promptly" informing disabled pilots of their lack of qualification, and (2) American knows there is no CBA provision that allows American to strip a disabled pilots seniority and terminate them. Therefore American, with the consent of APA, does not inform the disabled pilots in hopes of avoiding any issues.

**"F. Loss of Seniority** 1. Resignations, Retirement and Discharges**.** A pilot who ***resigns*** from the service of the Company, ***retires***, or is ***discharged for just cause***, shall ***forfeit all seniority as a pilot.***"

An MDD pilot does not fit these criteria and should not suffer a loss or forfeiture of seniority. An MDD pilot ceases to accrue seniority per CBA Section 11; they do not forfeit seniority or face termination. This was confirmed in the deposition of American's Director of Crew Qualifications, Jim Anderson, who is charged with administering the CBA.

Scott Hansen, American Director Flight Administration, made a declaration on July 25, 2016 and gave a deposition on October 17, 2016. Hansen's declaration and deposition conflict concerning termination of MDD pilots for "just cause" as does his statements concerning notification of terminations.

Hansen's declaration states that disabled pilots are terminated for "just cause" per CBA Supplement F(1)5.(d) . Supplement F(1)5.(d) reads:

> "(d) A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F only for a period of five (5) years commencing at the expiration of his paid sick leave."

It's obvious that Supplement F(1)5.(d) does not contain the words "just cause". Hansen is making a personal interpretation of the CBA and the words "just cause" and

"administratively separated" and admitted so in his deposition.  Hansen is not authorized to interpret the CBA.  Such actions are the jurisdiction of a System Board of Adjustment as stated in CBA Section 23 SYSTEM BOARD OF ADJUSTMENT:

> **"A. Establishment**
>
> In compliance with the Railway Labor Act, as amended, the parties establish the American Airlines System Board of Adjustment for the purpose of ***adjusting and deciding disputes*** which may arise under the terms of this Agreement and which are properly submitted to it. The System Board of Adjustment may be constituted as either a Four Member Board or a Five Member Board. ***All grievances*** properly submitted to the Board will be heard by a Four Member Board, unless the President of the Association, or in the case of a Company grievance, the Vice-President Flight, elects to proceed directly to a Five Member Board.

Dallas Grievance 12-012 (see SOF 60, 61, 63) states: "protesting the Company's [American] violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots System Seniority List **and** failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

American and APA have allowed the Dallas Grievance 12-012 to collect dust for over 5 years.  American and APA have both avoid the outcome of a System Board of Adjustment in order to keep the status quo of terminating pilots against any provision of the CBA and in violation of the ADA.

APA and American have used the words "just cause" and "cause" to indicate disciplinary issues.  When describing terminations the CBA uses the words just cause in only two places: (1) Supplement L(6)(3)(e) describes terminations due to a positive Drug Test, and

(2) Section 13 F. describes "Loss of Seniority" due to resignations, retirement, or discharge for just cause.

Someone with general knowledge of the pertinent CBA sections will see that Hansen's declaration and deposition are conflicted and disingenuous. Hansen's declaration and deposition also conflict with American's Director of Qualifications, Jim Anderson, who is tasked with administering the CBA.

64.    During ED proceeding APA's stance on the Dallas grievance was: (1) it only applied to pilots trying to return to the seniority list who possessed an FAA First Class Medical Certificate, (2) it **was not system wide** and only applied to the Dallas base, and (3) there was no affected pilot attached to the grievance.  APA clearly ignored the termination provision of the Dallas grievance.

65.    Ron Surkin, Preitz's attorney, and many other challengers (Ann Singer) vigorously argued, *inter alia*, that the termination provision of the Dallas base grievance applies system wide to all MDD pilots and therefore they should be considered TAG for ED purposes and awarded four silos.  APA vigorously opposed that view.

66.    During the ED proceedings APA lead attorney, Bennett Boggess, made a false and misleading declaration concerning the Dallas grievance.  His declaration was timed such that challengers could not respond and Boggess was not made available for testimony.  Therefore his declaration went uncontested.  Challenger Susan Twitchell's affidavit surrounding this issue will be referenced later in this claim.  In December 2016 Bennett Boggess was fired by APA President Dan Carey.

67.    Two years after the ED proceedings concluded, December 2015, APA attorney Mark Myers testified the Dallas and LaGuardia grievances **were in fact "system-wide"** and applied to all pilots.

68.     Mark Myers testified in December 2015 that APA notifies pilots about to be terminated for "cause", the TAG pilots.  But a pilot who has been on inactive status, unpaid sick, or disability for more than five years **is not notified by APA** when they are terminated, unless that pilot engages the APA first.  This is another form of APA's discrimination and lack of representation of disabled pilots.

69.     Scott Hansen's, AA Director Flight Administration, declaration of June 29, 2016 clearly states:

"In contrast, American's routine business practice prior to 2013-2014 ***was not to provide notice of APA or a pilot*** when a pilot drops off the seniority list under Section 11 (D)(1) or Supplement F of the CBA, ..."

Hansen is referring to disabled MDD pilots and is specifically stating that pilots drop off the seniority list per Section 11 (D)(1) and Supplement F, yet he does not, and cannot, provide any CBA reference that allows termination of disabled pilots.

70.     Captain McDaniels is an American pilot, past APA Membership Committee Chairman (2003-2010) and APA Board of Director Chairman of the Dallas domicile (2010-2014).  Capt. McDaniels made two declarations; (1) on July 8, 2013 during ED proceedings, and (2) November 19, 2015 in a federal lawsuit brought by MDD pilot Kathy Emery against the APA concerning the Equity Distribution.

The ED proceeding declaration of July 8, 2013 was misleads all interested parties to believe pilots could be terminated per Section 11.D. and Supplement F of the CBA.  This was done by the placement of the words "by operation" within the sentence structure.  Capt. McDaniels July 2013 declaration stated:

"It is ***first important*** to explain that, ***by operation of Section 11.D and Supplement F to the CBA***, APA Exhs. 5, 9, and 10, pilots who have been on Long-Term Disability for more than five years lose their right to placement on the

Pilots' System Seniority List, *are no longer employed by American*, are no longer...".

The November 19, 2015 declaration, to a Federal Judge, placed the words "by operation" in a different location:

> "This aspect of the grievance sought to fix the situation where, although a pilot could timely obtain a First Class Medical Certification before reaching five years of disability leave, American would automatically drop him or her from the seniority list *by operation* of Section 11(D)(1) and he or she would have no right to return to pilot employment...".

This subtle change in location of "by operation" can leave the reader to believe the pilot is removed from the seniority list by operation of Section 11(D)(1) and he or she has no right to return to employment for some other undisclosed reason. Supplement F(1) is not even mentioned.

This is another example of the APA misleading the Arbitrator during ED proceedings into believing terminations were allowed under the CBA and then not mentioning it to a Federal Judge when in fact APA knows such terminations are in violation of the CBA.

71.     During the ED proceedings the APA failed to disclose the existence of the LaGuardia base grievance ("LaGuardia grievance" or "LGA 11-054", dated August 11, 2011) with Rodney Charlson as the affected pilot.  This is evidenced by the fact that there is no reference to the LaGuardia grievance during the ED proceedings.

72.     The LaGuardia base grievance has only one basis, it states: ", for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."  This refers to the MDD pilots and there is **no reference to seniority reinstatement**.

73.    Preitz is a LaGuardia pilot and therefore covered by the LaGuardia grievance.

74.    APA and American successfully turned the LGA grievance into an individual grievance and then eliminated it via a confidential settlement agreement with Rodney Charlson.  Jim Anderson is American's Director of Crew Qualifications and stated his duty is to administer the CBA. Anderson stated that in his experience the APA has never converted a base grievance into an individual grievance.  Charslon benefited by returning to the seniority list, active employment with AA, and receiving a four silo share of Equity funds.  Neither the LaGuardia or Dallas base grievances have seen the light of justice; this seems by intention and design.  APA knows that AA terminating disabled pilots at five years is simply against any provision of the Collective Bargaining Agreement (CBA), a DFR violation and an ADA violation; yet APA is unwilling to fight the good fight.  APA's 5 year silence concerning the Dallas grievance speaks volumes concerning their manifestly unjust treatment of disabled pilots who have been out greater than five years.

75.    A revealing email was recently exchanged, August 20, 2016, between APA Board of Director Ed Sicher and the current APA President Dan Carey.

"Dan,

Thomas and I presented a motion at the Spring BOD to negotiate a change to the practice of removing pilots from the seniority list after five years [MDD pilots]... just as US Air East has done throughout its history.  *I think the issue was explained in enough detail to understand just WHY this is a bad idea, how it is not IAW the contract (cease to accrue is not removal from), and how it allows the company to keep pilots removed by Section 20 off of the seniority list when they have refused the company's offer of settlement as admitted by Scott Hansen [American's Director Flight Administration], almost as if they have been removed for Section 21. It also probably afoul of the ADA as I learned it during my Masters, since it discriminates against someone with a medical condition,* but we haven't ever really had the practice litmus tested by lawyers that are experts in this law.  As you know, Wally Preitz's lawyer has made convincing arguments relative to all of these positions and he isn't a legal quack but one of the most prestigious in this area of law.

APA legal has quite a few "dogs-in-this-fight" and Bennett Boggess [APA chief council], although tasked with researching this motion, has yet to provide one iota of information on exactly what the ramifications of the motion would be.  Can he even provide us with unbiased research in the first place? *I think not.*

We at APA seem to be so *afraid of a DFR* that we won't step us to the plate and do the right thing for fear of exposing past possibly bad decisions.

Let's clear the air on this issue.  Please consider starting by changing the practice of locking these guys [MDD pilots] out of C&R [APA's virtual online union hall that Keith Wilson (past APA president) locked MDD pilots out of after the Equity Distribution challenges].  Even though it would be a small change in policy, it would go a long way in signaling to these pilots that we haven't abandoned them and that there is new leadership at APA willing to break with Keith's [Previous APA President] bad practices.

Then please follow up by cracking the whip on APA's in-house legal to objectively evaluate this practice and figure out how to change it instead of continue it.

Regards,

Ed Sicher
MIA Vice"

August 21, 2016 response by APA President Dan Carey reads:

*"Ed,*

*I am in complete agreement with you.  I will allow them back on CR this week.*

*Dan"*

On or around 2014 Kathy Emery brought action (case no. 14-80518 – CIV HURLEY, Southern District of Florida) against the APA for locking her (an MDD pilot) out of C&R.  Judge Hurley ruled, January 4, 2017, in Emery's favor and she was reinstated to C&R.  At some point after the Emery decision the APA reinstated all MDD pilots to C&R.  Unfortunatley the damage was done to the MDD pilots who were locked out of C&R from April 2014 till January 2017, a critical time when their seniority future was being put in jeopardy by the APA during the post-bankruptcy seniority integration process.

## July 19, 2013 Declaration of Bennett Boggess

76.     On July 19, 2013 Boggess submitted his Declaration the same day Preitz, and others, presented their cases at the merits hearing. Mr. James told the challengers that Boggess would not appear during the hearings, therefore no questioning occurred.   Both are questionable tactics done by an organization created to represent all its members fairly and equally.

77.     The Boggess declaration simply doesn't hold water concerning the Dallas grievance. One will notice that Boggess's Declaration was intentionally crafted to include and exclude information: (1) the affected pilot, Susan Twitchell, is not mentioned, (2) it does not mention the scope of pilots affected (i.e. individual, base, system wide), (3)  It misrepresented that is was simply a grievance for improving a process and notification of falling off the seniority list, (4) Boggess neglected to state the grievance was clearly written to contest the administrative termination of disabled pilots which is a clear violation of the CBA, and (5) Boggess avoided Preitz's testimony that APA lawyers verbally told Preitz he was TAG by virtue of his ERISA suit.  Boggess's declaration was uncontested because of the short notice in which it was presented, on the same day as the merits hearings.

78.     July 15, 2016, Susuan Twitchell filed a Declaration in the Southern District of Florida Palm Beach Division, Case No. 14-80518. The declaration, *inter alia*, covers: (1) APA abrogating its duty of fair representation, (2) intentional inaccuracies of Boggess's declaration, July 19, 2013, (3) termination of LTD pilots against any provision of the CBA, (4) the Dallas Base grievance, and (5) past practice. Bennett Boggess, APA Director of Representation, was fired in December 2016 by APA President Dan Carey.

79.     July 15, 2016 Susan Twitchell filed a second Declaration in the Southern District of Florida Palm Beach Division, Case No. 14-80518.  The declaration, *inter alia*, accuses two APA lawyers (Bennett Boggess Director of Representation and Mark Myers) of: (1) intentional false and misleading statements surrounding the content and preservation of the Dallas grievance

under the new 2013 CBA, with the motive of deceiving the Arbitrator, and (2) Mark Myers giving false and conflicting testimony during his deposition of December 2015.

## Decision and Award

80.     The Arbitrator sustained Preitz' challenge treating Preitz as a category 2 pilot eligible for three silos out of a possible four silos. The award was solely based on the one provision of Preitz's ERISA suit seeking *Long Term Disability (LTD) benefit restoration*. **The award was not based on Preitz's ERISA suit seeking reinstatement to the seniority list or its presumption of success and ability to improve Preitz's status**.

81.     The Decision and Award referenced the seniority reinstatement relief sought in Preitz's ERISA lawsuit.

82.     Challenger Lawrence Meadows grievance of February 4, 2012 grieved, *inter alia*: (1) termination, and (2) seniority.

83.     The Arbitrator sustained Lawrence Meadows ED challenge and awarded all four silos:

> I accept APA's position and do not require APA to deviate from its policy of using the TAG denomination solely to refer to pilots who have a grievance pending that challenges their termination for cause. I do, however, hold that it is arbitrary for APA to treat pilots who have a pending TAG grievance as sufficiently likely to be successful that they will be treated, for purposes of Equity Fund eligibility, as if they will be successful, while treating differently pilots who have a pending non-TAG grievance that challenges an administrative termination.

> APA offers no explanation for this different treatment, other than to state, as previously noted, that its treatment of TAG pilots is "consistent with APA's advocacy for these pilots' reinstatement to active status and with the fact that a substantial portion of pilots on TAG have been reinstated." APA ignores the fact that it also is advocating for FO Meadows, albeit for reinstatement to the seniority list. Furthermore, while the assertion that "a substantial portion of pilots on TAG have been reinstated" may be true, it is wholly unsupported by evidence in the record. Nor is there record evidence that a grievance seeking reinstatement to active duty is more likely to be successful than a grievance seeking reinstatement to the seniority list.

> FO Meadows' challenge is sustained and APA will be directed to make him eligible for a distribution from all silos.

84.     In sustaining Meadows and Preitz's challenges the Arbitrator noted and ruled:

- It was arbitrary for the APA to treat "TAG grievance" and "non-TAG grievance" pilots differently for Equity Fund eligibility. **The Arbitrator required that APA's TAG presumption of success, APA's basis for awarding TAG pilots four silos, should be extended to pending non TAG grievances and lawsuits.**

- APA could not support their assertion that "a substantial portion of pilots on TAG have been reinstated".

- The APA was actually advocating for Meadows "reinstatement to the seniority list".

- If Meadows grievance is sustained his administrative termination would be overturned and he will be back on the seniority list *presumably retroactive to the date he was remove,* November 4, 2011 (*Emphasis added*).

- The Arbitrator would "not countenance his removal from the seniority list in the period between November 4, 2011 and the date of the arbitration award. In sum, then, it is reasonable to assume that if the grievance is sustained, FO Meadows would be treated by the arbitrator as a pilot who should have been on the seniority list on January 1, 2013, the date on which pilots on the seniority list are eligible for recovery from all four silos, even if they were on LTD status."

- **The Arbitrator would treat, for ED purposes, a grievance and a lawsuit as equally likely to obtain an advantageous change in status for the pilot.**

85.    Meadows did not possess a FAA Class I Medical Certification during the ED proceedings.

86.    Preitz's ED challenge specifically states: "It is arbitrary and discriminatory to treat me differently than other pilots similarly situated."

87.    On November 14, 2013 Preitz submitted a clarification to the Arbitrator which was denied one day later on November 15, 2013. It doesn't seem the Arbitrator gave the clarification due respect.  The clarification pointed out the disparate treatment of similarly situated pilots, Preitz and Meadows, both of whom sought reinstatement to the seniority list, Meadows via a grievance and Preitz via an ERISA lawsuit. The Arbitrator awarded Meadows four silos based on a grievance seeking reinstatement to the seniority list.  The Arbitrator awarded Preitz three silos based on an ERISA suit seeking LTD benefit reinstatement. **The arbitrator arbitrarily, and with discrimination, intentionally neglected the reinstatement to the seniority list provision of Preitz's ERISA suit which would have resulted in a four silo award similar to Meadows.**

# Post Decision and Award situations

## Rodney Charlson award

88.    The ED proceedings and "clarification period" ended November 15, 2013.  Six months later, May 15, 2014, Charlson contacted the APA to request an ED payout of four silos.

89.    Charlson was an MDD pilot who did not participate in the ED process.

90.    Myers testified, December 2015, that Charlson possessing or not possessing an FAA First Class Medical Certificate did not matter concerning Charlson receiving four silos.

91.    Charlson's LaGuardia grievance (11-054) does not seek seniority reinstatement.

92.    On or about May 17, 2014, two days after requesting four ED silos, the APA paid Charlson four silos.

## December 11, 2015 deposition of APA attorney Mark Myers

93.    Mark Myers was deposed during discovery of Kathy Emery's APA ED suit filed in United States District Court Southern District of Florida Civil Action No. 14-cv-80518.

94.    Myers testified, *inter alia,* that: (1) the Dallas and LaGuardia grievances **are both "system-wide"** and affect all pilots regardless of their base, (2) **both** grievances seek reinstatement to the seniority list, (3) Charlson is the affected pilot of the LaGuardia grievance, (4) LaGuardia grievance was converted to a individual grievance and **resolved via a confidential settlement agreement with AA**, (5) Twitchell is the affected pilot of the Dallas grievance which remains unresolved, (6) the Dallas and LaGuardia grievances both protest termination of pilots without notice, (7) Charlson was awarded four silos irrespective of having or not having a FAA First Class Medical Certificate, (8) Charlson's request for four silos was reviewed "after Goldberg's award", (9) the LaGuardia grievance **does not seek** reinstatement to the seniority list, and (10) Rodney Charlson and other unnamed MDD pilots received four silos after the Decision and Award.

95.    At the July 19, 2013 ED Merits Hearing APA lawyer, Mark Myers, cross examined Preitz concerning the scope of the Dallas grievance. APA took a forceful stance that the Dallas grievance was only applicable to the Dallas base and did not cover pilots system wide.

96.    Myers December 2015 deposition is in direct conflict with the APA's position taken at the ED Merits Hearing in July 2013, where he was disingenuous and intentionally states that Preitz and other non-Dallas based pilots (Lawrence Meadows) were not covered by the Dallas grievance. **Such an ED hearing argument was designed to exclude "300" disabled pilots from receiving Equity funds from all four silos based on the Dallas Grievance.**

97.    Two years later, December 2015, Myers admits, under oath, that the Dallas and LaGuardia grievances apply system-wide and seek reinstatement to the seniority list. **Given the Arbitrator's presumption of success of grievances and lawsuits, for ED purposes, it would follow that the "300" MDD pilots should receive four silo ED funds.** The "300" did not receive four silos and this is unjust discrimination against disabled pilots.

98.    Myers statements during the ED proceedings, 2013, are not in line with his testimony of December 2015. Myers brought fraud to the Equity Distribution proceedings, upon all parties involved (Arbitrator, challengers, opposing attorneys, etc…), and breached the confidence

instilled in him as an attorney. All in a thin vialed attempt at excluding 300 disabled pilots from Equity funds and avoiding APA's duty of fair representation.

99.     Myers states:

> "A decision was made that – given Goldberg's award, that APA would extend to any other affected pilots the – the award that was dictated by – or not dictated, but written by Goldberg. ***Because Rodney had a open grievance seeking reinstatement to the seniority list, he was given -- he was treated the same as those other pilots seeking reinstatement to the seniority list and given four silos.***"

This is flawed logic because the LaGuardia grievance **does not seek** reinstatement to the seniority list.

## Preitz seniority integration grievance and Seniority Integration Arbitration Award

100.    American emerged from bankruptcy in December 2013. The new American Airlines was a merger of legacy American and U.S. Airways, this created a seniority integration process for the pilot that's lasted years. In September 2016 the New American Airlines Pilots Seniority Integration Arbitration panel ruled and presented its integrated seniority list.

101.    Pursuant to the "Seniority Integration Protocol Agreement" (SIPA) and the Memorandum of Understanding (MOU): the APA, US Airline Pilots Association ("USAPA" representing US Airways pilots "East" and "West"), American Airlines, and US Airways, Inc., agreed to a seniority integration process consistent with McCaskill-Bond and Allegheny/Mohawk LPPs. This seniority integration was part of the AA December 9, 2013 reorganization plan.

102.    Seniority merger committees were formed by both the APA and USAPA.

103.    The American Airlines Pilots Seniority Integration Committee (AAPSIC) was formed to represent the interests of legacy APA pilots and chaired by Captain Mark Stephens.  The AAPSIC was charged with compiling and exchanging certified seniority lists with committees representing the USAPA (US Airways "East" and "West") and all other interested parties: "The certified lists will reflect the status quo of the three lists in effect at the carriers on *December 9, 2013*…"    A three member arbitration panel was formed to rule and compile an integrated seniority list.


104.    February 25, 2016 Preitz wrote Bennett Boggess, APA Director of Representation, concerning the absence of Preitz's information on the AAPSIC "Certified Seniority List".  Preitz, *inter alia*, pointed out that his ERISA suit specifically sought reinstatement to the seniority list. Preitz asked for a review, correction of the error, and confirmation of correction which consisted of ensuring that Preitz's pertinent seniority integration information was complied, certified and exchanged with the proper parties and committees.  Boggess never responded to Preitz's letter.

105.    March 3, 2016, Preitz wrote AAPSIC Chairman Captain Stephens, and all interested parties, concerning the same issues addressed in Preitz' letter to Boggess dated February 25, 2016.  Capt. Stephens replied that Preitz's pertinent information would be exchanged with the parties.  However over the next month the certified list was not updated to reflect Preitz's information.

106.    April 4, 2016 Preitz filed an expedited seniority integration grievance with APA and AA.

107.    On April 18, 2016, APA President Keith Wilson (voted out of office July 1, 2016) and AA Managing Director Labor Relations responded to Preitz's grievance of April 4, 2016.  Their collective response did not address all grievance issues raised but did confirm, via email only (not by production of the Certified List), that Preitz's pertinent information was exchanged with the proper parties. Their response included two of Captain Stephens March 6, 2016 emails; the first email was addressed to Preitz:

"Your name [Preitz] is not included on the AAPSIC's proposed integrated seniority list because you were not on the American Airlines Pilots system seniority list as of the stipulated *snapshot date, 12/9/2013.*

*Your name was not included* with the certified list AAPSIC provided to the parties and arbitrators under Section 2.a(7) of the Seniority Integration Protocol, because your name *was not provided by* the APA or American Airlines as a pilot with **litigation**/grievance pending *that was seeking and could result in your reinstatement to the seniority list. Upon review of your letter and the status of your lawsuit*, we are *notifying the parties and arbitrators that your name should be added* to those of the pilots identified in the AAPSIC list as a pilot *whose seniority status is the subject of any pending litigation or dispute.*

The second email, from Capt. Stephens, was addressed to the Seniority Integration Committee Chairman of US Airways "East"(Kelly Ison) and "West"(Russ Payne), which stated:

"Mr. Preitz has a *pending ERISA lawsuit that could potentially impact his prior removal from the seniority list* after more than five years in a disability status. This email serves to update the *AAPSIC certified list (TAG Pilots tab)* to include his name and data as follows:"

108.    Captain Stephens is: (1) an Equity Distribution Committee member, (2) AAPSIC committee chairman, (3) also a practicing attorney in Texas, and (4) a current active American Airlines pilot. Captain Stephens is well qualified to make such assessments.

109.    Equity Distribution Arbitrator Goldberg presented a question on page 63 of the ED Decision and Award, it reads:

iii.    *Did APA act arbitrarily in declining to treat FO Emery and FO Preitz similarly to TAG pilots – assuming for Equity Fund purposes that their grievances and/or ERISA suits would result in a change of status that would make them eligible for Equity Fund participation?*

110.    It's extremely clear that in March 2016, 2 ½ years after the ED proceedings, Captain
Stephens (AAPSIC chairman, Equity Distribution member, and Texas practicing attorney)
answers the Arbitrators question very clearly concerning a change in status that Preitz' ERISA
suit possess: "Mr. Pretiz has a pending ERISA lawsuit that could
*potentially impact his prior removal from the seniority list*
after more than five years in a disability status." (SOF 107)

111.    To reemphasize: (1) the APA 's Eligibility and Allocation gave the presumption of
success to TAG pilot's grievances and awarded them four silos, (2) the Arbitrator's Decision
ruled that he would treat, **for ED purposes**, a grievance and a lawsuit as equally likely to obtain
an advantageous change in the pilot's status, (3) the Arbitrator gave that presumption of success
to Meadows February 2012 grievance seeking, *inter alia*, seniority reinstatement and awarded
Meadows four silos based on the date he was removed from the seniority list, November 2011,
(4) post the clarification period the APA extended the Meadows award and awarded Charlson
four silos based on his grievance seeking seniority reinstatement.  It is blatantly obvious that
Preitz was discriminated against and not treated like other similarly situated pilots.  Preitz should
receive four silos of ED funds based on his ERISA suit seeking reinstatement to the seniority list,
Capt. Stephens emails, and all other evidence presented in this claim. However, Arbitrator
Goldberg discriminated against Preitz and did not treat him like other similarly situated pilots.
When this disparate treatment was pointed out to the Arbitrator on November 14, 2013 (during
the Clarification period) he immediately denied it on November 15, 2013, seemingly without due
consideration.

112.    When the AAPSIC exchanged certified lists with all interested parties, including the
arbitrators, they had broken the list into various tabs:

"AAPSIC Proposed list" tab included approximately 10,000 pilots.  Among others it contained
active pilots and pilots on inactive status, unpaid sick, or disability for **less than** five years
(properly included in accordance with CBA Section 11(D)(1)).  For reasons the AAPSIC,
American, and the Arbitrators refused to explain it also contained a small number of MDD
(American referred to these pilots as MDSB) pilots.  These MDD pilots should not have been on
the certified list as they had been removed from the seniority list per CBA Section 11(D)(1) for

**exceeding** five years on inactive status, unpaid sick, or disability.  No one would explain why eleven MDD pilots were included while approximately 300 other similarly situated MDD pilots were excluded, a clear discrimination no one was willing to account for.

"TAG Pilots" tab contained twelve pilots and also contained errors.  This is the list the AAPSIC committee chairman, Captain Stephens, had informed all interested parties that Preitz's pertinent information would be included in (SOF 107).

These and many other points were brought to the Seniority Integration Arbitrators attention in a March 9, 2016 letter from Preitz.


113.    In early September 2016 the three member New American Airlines Pilots Seniority Integration Arbitration panel provided their decision which included the integrated seniority list (ISL).  Eleven MDD pilots were included ("Pulled and Plugged") on the ISL while approximately 300 other similarly situated MDD pilots were **excluded.**  Preitz was not on the integrated seniority list or on any attachment.  It seems AA and APA were protecting eleven MDD pilots and discriminating against 300 other disabled MDD pilots.

114.    The list of 300 MDD pilots is constantly changing as new pilots exceed the five year limit and are added to the MDD list while others are removed for various reasons (retirement, death, return to active flying, etc…)

115.  During the seniority list arbitration process multiple Legacy American MDD pilots informed all interested parties (AAPSIC, US Airways East and West seniority integration committees, American Airlines, the three Arbitrators, etc…) concerning errors contained in the AAPSIC Certified List.  These errors included, *inter alia,*: (1) inclusion of eleven MDD pilots who were "pulled and plugged" even though they exceeded five years of disability prior to the "Snapshot date" of December 9, 2013, (2) absence of  pertinent information of  approximately 300 similarly situated MDD pilot's including Preitz, and (3) pertinent information of pilots contained errors.  Multiple MDD pilots received no response from any of the interested parties.

116. April 2016,  Preitz received a cosigned response from American Airlines and APA President Keith Wilson.  In part it reads:

"The parties did agree in the Protocol Agreement that *any claim* a pilot affected by the integrated seniority list may have *regarding the award* issued by the SLI arbitrators would be referred to the post-award dispute resolution process for review. Information about that process will be published when the award is issued." They told Preitz he would have a venue to dispute the seniority list award.

117.  September 2016.  The "dispute resolution process" published with the decision and award stated that claims brought to the Dispute Resolution Committee (DRC) can only be brought by a pilot whose name **appears** on the ISL, by a group of pilots whose names **appear** on the ISL, or by a DRC member.  This contradicts the April 18, 2016 AA/APA letter to Preitz that stated that "**any claim** a pilot affected but the integrated seniority list" would be referred to the post-award dispute resolution process.

118.  The DRC is made up of three members: (1) Capt. Kelly Ison of US Airways East, (2) Capt. Russ Payne of US Airways West, and (3) Capt. Mark Stephens of the AAPSIC representing the APA pilots of legacy American Airlines. Capt. Stephens is the same person who was a lead member of the 2013 APA Equity Distribution Committee who tried to limit ED payouts to MDD pilots via discriminatory practices.  He is also the AAPSIC committee chairman who supposedly exchanged the "AAPSIC certified list" with all interested parties, the same list that was supposedly "verified" but contained numerous errors; included eleven MDD pilots who had exceeded five years on disability and excluded 300 similarly situated MDD pilots.

119.  Preitz submitted a dispute, December 3, 2016, to the DRC and asked Captains Ison and Payne to: (1) champion the cause of the excluded 300 MDD pilots including Preitz, and  (2) recuse or remove Capt. Stephens from the DRC due to his past history with MDD pilots and his conflict of interest.

120.  The DRC rejected Preitz' dispute on January 26, 2017 based on having no jurisdiction over Preitz's claim.  The DRC's rejection contradicts the AA/APA letter to Preitz dated April 18, 2016.   That letter stated that "**any claim** a pilot affected by the integrated seniority list" would be referred to the post-award dispute resolution process. It's obvious Preitz was "affected by the

integrated seniority list" but he was left with no process to be heard. (SOF 116, 117, 118, 119). The DRC's decision was rendered by only two members of the DRC, one from the APA and the other from US Airways West.

## APA/AA LETTER OF AGREEMENT (LOA), October 2016

121.  "APA News Digest" of October 21, 2016 states:

> "Negotiating Committee Chairman CA Dave Rintel reviewed the committee's progress year to date on a lengthy list of items and announced that APA and management [American Airlines] had recently reached two letters of agreement with management:

> "Regarding the elimination of the five and eight year limitations on the retention and accrual of seniority for LAA [Legacy American Airlines] and LUS West [Legacy US Airways West] pilots who have a medical disability as defined in Supplement F(1).5.a. The parties agree that these pilots (LAA and LUS) **will continue to accrue seniority while disabled**."

> "The board [APA Board of Directors] subsequently voted to approve motions authorizing APA President Dan Carey to sign the letters of agreement."

**Due to this LOA pilots will no longer be removed from the seniority list and "administratively terminated" by American Airlines.**  I believe the above reference to Supplement F(1)5.a. is a typo, Supplement F(1)5.(d). refers to the retention and accrual of seniority at five years.

122.    SOF 121 above, not only applies to CBA Supplement F(1)5.(d). but by default applies to Section 11. D. 1. Section 11.D.1 speaks to retention and accrual of seniority when exceeding five years of sickness or injury.

123.  Changing contractual language outside of contract negotiations is unprecedented for American Airlines CEO Doug Parker.  Mr. Parker has a strong reputation of living by the black

and white of a contract and not modifying CBA provisions outside of open contract negotiations. This begs the question as to why such a change occurred. In the plaintiffs mind the answer is simple: (1) Removing disabled pilots from the seniority list and "administratively terminating" them is a violation under the ADA, (2) a CBA violation, and (3) a DFR violation on the part of the APA.

124. October's LOA between American and APA created a "dough nut hole" for MDD pilots. No grandfather provision was included to protect past MDD pilots negatively impacted by APA and American's past violations. Approximately 300 MDD pilots will not have their seniorities protected and will only be allowed to return to work by the good graces of American and the APA, something American has used as a punitive measure since November 2011. Jim Anderson is Americans Director of Crew Qualifications: Anderson stated his duty is to administer the CBA. Anderson agreed that returning a pilot to the seniority list occurs "In many cases, not all." As stated by Capt. McDaniels declaration of June 10, 2016:

> "Before American filed for bankruptcy in November 2011, those discussions led to reinstatement for the overwhelming majority of formerly disabled pilots who had obtained an FAA medical certificate and were willing and able to return to work. Once it [American] filed for bankruptcy in November 2011, however, **American changed its practice and refused even to sit down** with APA representatives to discuss the prospects of reinstatement for any individual pilot how had overcome his or her disability, obtained an appropriate medical certification, and sought reinstatement. The DFW Domicile Grievance [12-012] challenged that blanket refusal to engage in individualized discussions."

Once again, the APA has refused for 5 years to push the DFW grievance forward, it simply collects dust.

There were a select number of pilots who returned to the seniority list between November 2011 and the signing of the October 2016 LOA. These pilots were in some cases "good old boys" and had settlement agreements with American.

So why did APA and American choose not to protect these 300 pilots under the October LOA? In the petitioners mind the answer is simple: (1) placing 300 MDD pilots on the seniority list will

make them eligible for all four silos of Equity Distribution and cost the APA **$15,000,000.00 to $30,000,000.00**, (2) MDD pilots the APA considers combative and litigious would be back on the seniority list, and (3) the APA would be admitting to past poor judgement which could cost APA committee members and legal staff their jobs and reputations. To restate, the APA Director of Representation was fired in December 2016 by the APA President.

125.    American's and APA October 2016 LOA returned one MDD pilot, Joe Barkate, to the Integrated Seniority List (ISL). Barkate is the first legacy American MDD pilot to be reinstated to the ISL since the arbitrator's ISL award of September 2016. Barkate is: (1) a pilot who went on disability on or about September 15, 2008, (2) on or around September 15, 2013 Barkate was removed from the seniority list in accordance with CBA Section 11 (D) and Supp F(1), (3) Barkate was not included in the AAPSIC Certified List, (4) Barkate does not have an FAA First Class Medical Certification and has so stated, (5) it's unknown if Barkate received any Equity Distribution funds during the 2013 ED process, (6) it's unknown if Barkate received any Equity Distribution funds after he was reinstated to the ISL in October 2016, and (7) Barkate is an APA insider, APA Appeal Board member, and committee member for the DFW domicile.

126.    This special treatment of Barkate begs the question. Why is Barkate being treated differently than hundreds of other similarly situated MDD pilots who were not reinstated to the ISL and were also not on the seniority list as of December 9, 2013. It appears to be blatant discrimination and a DFR violation on the part of the APA.


## APA comparing Twitchell to Preitz


127.    Susan Twitchell is an American MDD pilot whose LTD benefits were terminated by AA. Twitchell then filed an ERISA suit. In early 2016 Susan Twitchell approached APA, in a similar fashion as Rodney Charlson, and requested a four silo Equity Distribution fund payout based on her being the affected pilot under the Dallas grievance. Twitchell like Charlson did not participate in the Equity Distribution process of 2013. Twitchell was aware of Myers deposition given in December 2015.

128.    Captain Stephens email, to Preitz, of March 6, 2016 acknowledged that: (1) Preitz's "...
seniority status is the subject of any pending litigation or
dispute." and (2) "...your [Preitz's] position on the integrated
seniority list will be determined consistent with the legal
ruling [Preitz's ERISA suit]..." (see SOF 107)

129.    On March 6, 2016 Captain Stephens informed the Seniority Integration Chairman of U.S.
Airways East and West that Preitz's ERISA suit could impact his removal from the seniority list.
(see SOF 107)

130.    On April 18, 2016 APA and AA responded to Preitz's Seniority Integration grievance.
The response was signed by then APA President Keith Wilson and was surely reviewed or
written by APA legal.  The response included Captain Stephens emails of March 6, 2016, which
acknowledged the presumptive success of Preitz's ERISA suit seeking reinstatement to the
seniority list.

131.    On June 7, 2016 APA denied Twitchell's request for four silos.  Prior to responding to
Twitchell the APA was fully informed, fully aware, and confessed, that Preitz's ERISA suit
sought reinstatement to the seniority list.

132.    APA's response, June 7, 2016, to Twitchell states:

> "Specifically, the Decision and Award Determined that certain pilots no longer on the
> seniority list with pending grievances seeking **_reinstatement to the seniority list_**
> **_(e.g., Lawrence Meadows) were entitled to all four silos_** and certain other pilots
> seeking to restore disability benefits through grievances or federal ERISA lawsuits, (e.g.,
> Kathy Emery and Wally Preitz) were entitled to two or three silos depending on their
> specific circumstances.  See Decision and Award at 5864."

133.    The APA, in referencing Preitz' ERISA suit, intentionally misleads and neglects the fact
that Preitz' suit **specifically** asks for "reinstatement to the seniority lists" as
part of Preitz' relief.  At the time APA responded to Twitchell they were well aware that Preitz's

ERISA claim sought reinstatement to the seniority list. However, to limit Twitchell's payout the APA made the narrowest comparison possible and compared Twitchel to Preitz's claim provision seeking restoration of LTD benefits, thereby limiting Twitchell's ED payout. Twitchell was the affected pilot of the Dallas Greivance which seeks seniority reinstatement, therefor she is analogous to Meadows and Charlson who both received four silos.

## Preitz requests four silos from APA, Summer 2016

134.    June 5, 2016, Preitz in good faith asked the APA to review his three silo award.

135.    June 17, 2016, the APA denied Preitz's request for the fourth silo.  The APA stated that Preitz's award was based on an ERISA suit seeking restoration of LTD benefits.  The APA ignored the fact that the suit seeks, *inter alia*, restoration of seniority.  The letter also ignored Captain Stephens recent emails, March 2016, to U.S. Airways Seniority Integration chairman stating that the ERISA suit could: "*impact his prior removal* from the seniority list after more than five years in a disability status." (SOF 107)

136.    On July 18, 2016 Preitz, in good faith, wrote Captain Carey (APA President) and Bennett Boggess (APA Legal) to resolve the dispute and clarify facts.  Arbitrator Goldberg was copied on the email.

137.    APA did not respond to Preitz's letter of July 18, 2016.

138.    ED proceedings provide no particular time limit for the Arbitrator to the exercise his jurisdiction to resolve disputes about the interpretation or application of the Decision and Award.

139.    August 22, 2016 Preitz submitted the ED dispute to Arbitrator Goldberg and requested his intervention.

140.    August 27, 2016 Arbitrator Goldberg directed APA to respond by close of business on Monday, September 12, 2013.

141.    Friday, September 9, 2016, at 6:25 PM, APA requested a one week extension to respond. This was done late on a Friday when the response was due close of business on Monday.

142.    Friday, September 9, 2016, at 11:17 PM, Preitz wrote the Arbitrator to oppose any extension requested by APA.  The Arbitrator approved APA's extension.

143.    September 19, 2016 APA responded to Preitz and the Arbitrator.  APA's "Opposition to Preitz's Complaint" purports to rely on four assertions: (1) that Captain Stephens, as the AAPSIC Chairman and ED committee member, `does not speak for or have the authority to bind APA.`, (2) That `none of the "newly discovered" evidence matters...`, and (3) that regaining a FAA First Class Medical Certification is somehow related to ED payouts, and (4) the complaint is untimely.

Assertion (1):  "APA Board of Directors - Approved Eligibility and Allocation", "Appendix B – Equity Distribution Specific Dispute Procedure", "I. Introduction", states:

> "The Equity Distribution Committee ("EDC"): The EDC members are ***Captains Mark Stephens***, Doug Pinion, Mickey Mellerski, and First Officers Mike MacMurdy and Dave Quinlan. The EDC can be contacted at EquityDispute@alliedpilots.org. ***The EDC is acting as agent for, and on behalf of, the APA Board of Directors*** whose decisions are or may be at issue in these proceedings."

Its obvious Captain Stephens does speak for and has the authority to bind the APA.

Assertion (2):

> "***None*** of the "newly discovered" evidence [Myers December 2015 deposition (SOF 79 & 96) and Capt. Stephens emails of March 2016 (SOF 107, 108, 110, 130)] ***matters***, however. At most, it shows ***that since*** the Award APA has consistently acknowledged that FO Preitz's ERISA suit ***could result in his reinstatement to the seniority list***."

The key words are "**that since**". This is an admission that APA mislead the arbitrator during the 2013 ED proceedings in a thinly vailed attempt to limit ED payouts to disabled pilots such as Preitz.  In March 2016 the APA, Capt. Stephens, confesses that Preitz's ERISA claim does in fact contain a seniority reinstatement provision.  This evidence would make Preitz analogous to

Challenger Meadows who had a grievance seeking seniority restoration which resulted in an arbitration award of four silos.

Assertion (3):  That regaining a FAA First Class Medical Certification is somehow related to ED silo payouts.  Nothing could be further from the truth.  ED payouts were based on the presumptive success of grievances/lawsuits which could improve the status of the pilot. Meadows received a four silo arbitration award based on a grievance seeking seniority reinstatement.  APA extended that award to Charlson who purportedly had a LGA Grievance seeking seniority reinstatement.  Meadows and Charlson received four silos irrespective of holding a FAA First Class Medical Certification; APA lawyer, Mark Myers, testified to such in his December 2015 deposition. Meadows at the time of the ED award did not hold a FAA first class medical certificate, it's believed Charlson did not hold one when APA awarded him four silos in May 2014.

Assertion (4):  APA believes the complaint is untimely.  APA themselves stated  `Although the rules [Equity Distribution] themselves put no specific time limit on raising disputes about "the interpretation or application of the Decision and Award." on …".  In another ED case a judge ruled against APA's untimely claim and allowed the case to proceed.  Additionally the arbitrator has accepted and ruled on multiple past complaints and obviously did not raise any timing issue in his response to Preitz's complaint.

144.  October 21, 2016 Arbitrator Goldberg denied Preitz's complaint based on: (1) The arbitrator does retain jurisdiction to fix his own errors, and (2) APA misconduct after the ED proceedings is not within the arbitrator's jurisdiction.  Of note, the arbitrator never stated that the complaint was untimely as asserted by APA.

> "His [Preitz] first charge – that the Arbitrator erred in awarding him only three silos – does not fall within the Retained Jurisdiction provision of the Equity Arbitration Decision and Award on which Preitz relies.  His second charge – that APA engaged in misconduct during and after the Equity Arbitration proceedings, and that its misconduct deprived him of the full share of the Equity fund to which he is entitled – is beyond the scope of the Arbitrator's reviewing authority as established in the Equity Arbitration procedure."

## Arbitrator Goldberg *ex parte* communications

145.    July 19th at 9:34 AM Preitz rejected APA's ED settlement proposal which consisted of putting Preitz in a class of individuals who are on LTD benefits that commenced before January 1, 2008.  This class of pilots would be eligible for two silos.

146.    ED hearings commenced July 19, 2013.   Kathy Emery, pilot and ED challenger, attended the hearings and overheard inappropriate *ex parte* communications between APA's ED lawyer, Mark Myers, and Arbitrator Goldberg.  Myers informed Goldberg of the specifics of APA's settlement offer with Preitz.  The same offer Preitz had rejected that very morning.

147.    Goldberg's Award to Preitz of October 15, 2013 states:

> "The challenge of FO Wallace Preitz is sustained.  As I did with Emery, I shall direct APA to treat FO Prietz as an ***LTD pilot whose benefits are ongoing – consistent*** with the relief FO Preitz seeks in his grievance.  Inasmuch as his LTD benefits commenced between February 1, 2004 and December 31, 2007, ..."

148.    Goldberg's award **is not** "consistent with the relief FO Preitz sought in his grievance".  Goldberg completely **disregarded** the reinstatement to the seniority list provision of Preitz's ERISA suit which would have made Preitz equivalent to Meadows and therefore eligible for four silos.  Goldberg's award is flawed and does not treat Preitz like similarly situated pilots as per Preitz's ED challenge.

149.    Preitz's Award mirrored the settlement Myers conveyed to Goldberg on July 19/20 during their ex parte communications.

150.    June 27, 2016 current American Airlines pilots, who are former Trans World Airlines pilots, filed suit in the U.S. Bankruptcy Court Southern District of New York, Case No. 11-15463 Chapter 11, against American Airlines and APA.  The suit accuses Arbitrator Goldberg of bias and improper *ex parte* communications while conducting arbitration between AA and APA.

151.    Arbitrator Goldberg engaged in ex parte communications with APA's ED lawyer Mark Meadows.  The result is Preitz's Award is arbitrary and discriminatory compared to similarly situated pilots Lawrence Meadows and Rodney Charlson.

## Additional Points

152.    The parties did not agree that the APA Equity Distribution Resolution Proceedings, conducted in violation of the Railway Labor Act, were final and binding.

153.    APA Board of Director's "Approved Eligibility and Allocation", April 3, 2013, Appendix A "General Lump Sum Dispute Resolution Procedure", paragraph 9 reads:

> "9.    Requirement to Exhaust Lump Sum Dispute Resolution Procedure
> No pilot or group of pilots may take legal action against the Association with respect to any Lump Sum Payment Dispute unless the Procedure has been invoked and exhausted by the pilot or group of pilots."

The simple wording shows that this dispute resolution procedure is not final and binding and once the "Procedure" is exhausted then legal action can commence.

154.    APA Board of Director's "Approved Eligibility and Allocation", April 3, 2013, Appendix B "Equity Distribution Specific Dispute Procedure" has no reference that states the ED dispute procedures are final and binding or that Arbitrator Goldberg has the jurisdiction to render them so.  APA would lead one to believe, by their response dated September 19, 2016, that the ED dispute procedures are final and binding but this is simply not the case for multiple reasons (see SOF 152 & 153, no final and binding in the Decision and Award, it was never agreed to in writing by all parties that it would be final and binding, the ED dispute procedures did not comply with the Railway Labor Act arbitration statutes or invoked under State of Texas Arbitration statutory provisions or Federal Arbitration Rules, etc…)

155.    APA is a labor organization as defined under the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. 402.

156.    APA documents define MDD pilots as members in good standing and Arbitrator Goldberg ruled APA owed a duty of fair representation to MDD pilots by awarding them ED funds.


157.    "Challenge and Response" (C&R), created in approximately 1994, is a pilot discussion forum that is the equivalent of a virtual union hall.  C&R is the most expeditious, cost effective, and direct form of commination a single APA member can have with the **entire 15,000 pilot membership**. Simply login, post your thoughts, and logout.  Other forms of APA communication limit contact to specific members/National Officers/Board of Directors and are not time or cost effective as C&R.

158.    Subsequent to the conclusion of the APA Equity Distribution process, November 2013, MDD pilots, and formerly disabled pilots, were speaking openly about APA's treatment of disabled pilots and the short comings of American's Long Term Disability benefits on the Challenge and Response (C&R) section of the APA website.

159.    On April 22, 2014, four months after the conclusion of the Equity Distribution process, the APA without explanation or notice, locked out Plaintiff and approximately 300 other MDD pilots from the C&R section of the APA website.  These MDD pilots had enjoyed C&R access since 1994, over 20 years.

160.    The 300 pilots locked out of C&R are pilots classified by the APA as "MDD".  This lockout policy has been and is the subject of ongoing disputes between the APA, AA and its disabled MDD pilots.

161.    Currently there are several Company grievances and arbitrations pending related to the C&R issue.  They now appear to be stymied by APA.

162.    Historically APA has classified "MDD" pilots as members in good standing and as members in good standing they've been granted access to C&R since its inception in approximately 1994.  Since April 2014 Preitz and others have been prevented from entering APA's virtual union hall after openly challenging APA's treatment of disabled pilots on C&R. This appears to be discrimination based on disability, a violation of the ADA.  This is not the

"free and democratic discussion" that the APA Policy Manual, Section 2.04
"Communications/Electronic", professes:

> "B. APA will maintain and support a website and an electronic forum system to be called
> Challenge & Response that will continue to support the free and democratic discussion
> of issues between members of the Association. "

163.  On or around 2014 Kathy Emery brought action (case no. 14-80518 – CIV HURLEY,
Southern District of Florida) against the APA for locking her (an MDD pilot) out of Challenge
and Response ("C&R"). Judge Hurley ruled, January 4, 2017, in Emery's favor and she was
reinstated to C&R. At some point after the Emery decision the APA reinstated all MDD pilots to
C&R. Unfortunately the damage was already done to the MDD pilots. These 300 pilots were
locked out of the APA's virtual union hall during one of the most critical times in their careers,
from April 2014 till February 2017. During that time frame their right to return to the seniority
list was sealed by the APA during the post-bankruptcy seniority integration process. The APA
did not fight for their return to the Integrated Seniority list and the 300 MDD pilots were left off
the Arbitrators Decision and Award of September 2016. The APA then failed to protect their
reinstatement to the seniority list with the October 2016 letter of agreement with American
Airlines. With that letter of agreement no future disabled pilot would be removed from the
seniority list from October 2016 forward. But a doughnut hole was created which excluded any
protection for the past 300 MDD pilots. At the most critical time in their careers the MDD
pilots were intentionally removed from communication, C&R, with the other 15,000 APA
members. The MDD pilots were left in the dark.

164.    APA Board of Director, Ed Sicher, contacted APA President, Dan Carey, on August 22,
2016 and requested, *inter alia,* that MDD pilots be reinstated to C&R. The APA President
responded August 22, 2016: `"I am in complete agreement with you. I will`
`allow them back on CR this week"`.

165.    The spring of 2016 Capt. Sicher submitted APA Resolution "R2016-30" to the APA
Board of Directors. R2016-30 asked, *inter alia,* for reinstatement of "all pilots" who have been

removed from the seniority list.  The APA placed the resolution in the Roberts rule of Order
graveyard for resolutions the BOD doesn't want to deal with.

166.    An APA list of MDD pilots was obtained during discovery in Emery v APA.

## CAUSE OF ACTION

## COUNT I:

## BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION
## OF THE RAILWAY LABOR ACT/BREACH OF FIDUCIARLY DUTY

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein
and says further that;

The failure of the Defendants to allocate in good faith the proceeds of the APA Board of
Directors approved Equity Distribution to Plaintiff is a breach of APA's duty to fairly represent
Wallace Preitz.

The effect of Defendants' failure to fairly represent in the allocation of the same payment of
compensation and benefits as is enjoyed by similarly situated pilot members of the APA is in
violation of the Railway Labor Act ("RLA")

APA Board of Director's "Approved Eligibility and Allocation", April 3, 2013, extended the
presumption of success to TAG pilot's grievances therefore making them eligible for four silos.
Arbitrator Goldberg's Decision and Award, October 15, 2013, extended that presumption of
success to non-TAG grievances and lawsuits.

The Arbitrator's four silo Award to Meadows was based on the presumptive success of Meadows
grievance seeking reinstatement to the seniority list.  Six months after the conclusion of the ED
proceedings the APA extended the Meadows Award, and awarded Charlson, May 2013, four
silos based on the presumption of success of Charlson's LaGuardia base grievance which the
APA contends seeks reinstatement to the seniority list.  A simple reading of LGA 11-054 reveals
that the LaGuardia grievance **does not seek** seniority reinstatement.  One can only conclude that
Charlson received special treatment: (1) based on his settlement agreement with American,

and/or the APA rewarded Charlson for no longer being a MDD disabled pilot and returning to active flying.

Goldberg's October 15, 2013 Award to Preitz of states:

> ",however, I, like APA, shall treat the lawsuit [Preitz ERISA suit*] seeking restoration of LTD benefits* no differently from a grievance seeking that result."

> "The challenge of FO Wallace Preitz is sustained.  As I did with Emery, I shall direct APA to treat FO Prietz *as an LTD pilot whose benefits* are ongoing – *consistent with the relief FO Preitz seeks in his grievance*" (*Emphasis added*)

Goldberg's award **is not** consistent, but inconsistent, with the relief sought in Preitz's ERISA suit.  Goldberg's ED Decision referenced the seniority reinstatement provision of Preitz's ERISA suit, then **Goldberg completely disregards** that provision and awarded Preitz three silos based on the reinstatement of LTD benefits provision of the ERISA claim. This narrow view of the ERISA claim resulted in less than a full share of ED funds to Preitz.  Goldberg's award is flawed and does not treat Preitz like similarly situated pilots as per Preitz's ED challenge.

On August 22, 2016 Preitz brought his complaint to Arbitrator Goldberg. Goldberg's denial decision of October 21, 2016 stated:

> "His [Preitz] first charge – that the Arbitrator erred in awarding him only three silos – *does not fall within the Retained Jurisdiction* provision of the Equity Arbitration Decision and Award on which Preitz relies.  *His second charge – that APA engaged in misconduct during and after the Equity Arbitration proceedings,* and that its misconduct deprived him of the full share of the Equity fund to which he is entitled – *is beyond the scope of the Arbitrator's reviewing authority* as established in the Equity Arbitration procedure."

> Concerning the merits of his decisions the arbitrator added "Some of the complaints might have had merit,…"

The APA Board of Director's "Approved Eligibility and Allocation", April 3, 2013, Appendix A "General Lump Sum Dispute Resolution Procedure", paragraph 9 reads:

"9.    Requirement to Exhaust Lump Sum Dispute Resolution Procedure

No pilot or group of pilots may take legal action against the Association with respect to any Lump Sum Payment Dispute unless the Procedure has been invoked and exhausted by the pilot or group of pilots."

Preitz has followed the Dispute Resolution Procedure and now brings this claim to the hands of the court.  The simple wording shows that this dispute resolution procedure is not final and binding and once the "Procedure" is exhausted then legal action can commence.

But for the arbitrary, discriminatory and deliberate, bad faith actions of the APA and Arbitrator Goldberg, Preitz would have enjoyed the same payment of benefit as is enjoyed by active members and similarly situated pilot members of the APA.

Bad faith acts perpetrated by APA have resulted in a loss to Preitz of approximately $60,000.00 to $70,000.00 as compared to other similarly situated pilots.

# COUNT II

## BREACH OF DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/BREACH OF FIDUCIARLY DUTY

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that;

The failure of the Defendants to allocate in good faith the proceeds of the APA Board of Directors approved Equity Distribution to approximately 300 MDD pilots of the APA is a breach of APA's duty to fairly represent those pilots and a possible violation of the ADA.

The effect of Defendants' failure to fairly represent in the allocation of the same payment of compensation and benefits as is enjoyed by similarly situated pilot members (TAG pilots

terminated for the physical infliction of substance abuse (drugs/alcohol)) of the APA is in violation of the Railway Labor Act ("RLA") and possibly the ADA.

The APA Board of Directors in their Eligibility and Allocation documents of April 2013, gave the presumption of success to TAG pilot's grievances it that the presumptive success of their grievances could obtain an advantageous change in the TAG pilot's status. That presumption was extended by Arbitrator Goldberg's Award to include non-TAG grievances and lawsuits (ERISA). Arbitrator Goldberg's Award extended that presumptive success to Meadows grievance seeking reinstatement to the seniority list which resulted in a four silo award for Meadows. Six months after the ED proceedings closed the APA extended the Meadows Award and the presumption of success to Charlson and awarded Charlson four silos based on Charlson's grievance. APA awarded Charlson four silos despite the fact that Charlson's grievance clearly does not seek reinstatement to the seniority list. This is discriminatory and unequal treatment of similarly situated pilots.

APA gave the presumption of success to TAG pilots that were terminated for "cause", due to their substance abuse issues which are physical in nature, and award them four silos valued as high as $160,000.00. Simultaneously APA ignored "300" other physically disabled pilots and awarded those pilots ED funds valued at approximately $0 to $55,000.00. APA drew a discriminatory line between two groups of physically inflicted and disabled pilots, the TAG pilots terminated for alcohol and drug abuse received full ED funds, and the "300" inflicted with a wide spectrum of physical problems did not.

Mark Myers testified, December 2015, that the Dallas and LaGuardia base grievances were in fact "system-wide" and applied to all pilots. This presumption of success and system-wide applicability should have been extended to the LaGuardia and Dallas base grievances during the ED hearings and resulted in the "300" MDD disabled pilots receiving four silos, much like APA extended that presumption to TAG pilots terminated for alcohol and drug abuse issues.

This bad faith act perpetrated by APA has resulted in a loss to the "300" MDD disabled pilots of approximately $15,000,000.00 to $30,000,000.00 as compared to other similarly situated pilots. Additionally the possible punitive damages under the ADA could be substantial as well.

## COUNT III

## BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/BREACH OF FIDUCIARLY DUTY

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that;

The failure of the Defendants to allocate in good faith the proceeds of the APA Board of Directors approved Equity Distribution to approximately 300 MDD pilots of the APA is a breach of APA's duty to fairly represent those pilots and a possible violation of the ADA.

The effect of Defendants' failure to fairly represent in the allocation of the same payment of compensation and benefits as is enjoyed by similarly situated pilots Lawrence Meadows, Rodney Charlson, and "94" furloughed pilots.

"APA Board of Director's Approved Eligibility and Allocation" mandated that "94" furloughed pilots who never completed new hire training would receive a full four silo ED Fund payout.  To receive that full ED payout the "94" had to fulfill the following: "`sign an enforcement letter and promissory note agreeing to complete flight training, fly at least one revenue flight if required to be placed on active status, and remain at AA in active status for at least 12 months after returning from furlough…`"

The presumption of success was given by APA to TAG pilots grievances and that presumption was extended by Arbitrator Goldberg's Award to Meadows grievance resulting in four silos for Meadows.  Six months after the ED proceedings closed the APA extended the Meadows Award, and presumption of success, to Charlson and awarded him four silos based on Charlson's grievance which APA falsely represented as seeking reinstatement to the seniority list.  The APA paid Charlson within two days of Charlson's requesting four silos from the APA.

Mark Myers testified, December 2015, that the Dallas and LaGuardia base grievances were in fact "system-wide" and applied to all pilots.  The presumption of success and system-wide

applicability should have been extended to the LaGuardia and Dallas base grievances during the ED hearings and resulted in the "300" MDD disabled pilots receiving four silos. However, "300" disabled pilots who had extensive careers with American were set to receive much less than a full four silo share, while "94" furloughed pilots who never completed new hire training were receiving four full silos of ED funds. It shocks the conscience that APA supports a group of furloughed pilots with no history of a career at American and simultaneously ignores another group of disabled pilots with extensive careers. This appears to be patently unreasonable, irrational, and blatantly discriminatory, speaks to the distorted culture at the APA surrounding disabled pilots, and is most likely illegal under the American with Disabilities Act and should be referred to the EEOC for investigation.

This bad faith act perpetrated by APA resulted in a loss to the "300" MDD disabled pilots of approximately $15,000,000.00 to $30,000,000.00 as compared to other similarly situated pilots. Additionally the possible punitive damages under the ADA could be substantial as well.

## COUNT IV

## BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/BREACH OF FIDUCIARLY DUTY/VILOATION OF ADA

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that;

APA has not enforced the provisions of the Collective Bargaining Agreement as it pertains to American's termination of pilots who have been on inactive status, unpaid sick, or disability for more than five years. These terminations have been in violation of any provision of the CBA and ADA, and are so noted in Captain Ed Sicher (APA Board of Director) email of August 20, 2016 to APA President Dan Carey. APA President's response of August 21, 2016 stated: "I am in complete agreement with you".

Previous APA President (Keith Wilson) showed distain for disabled pilots and actually supported termination by; (1) not upholding the CBA, (2) being complicit in Americans termination of disabled pilots, (3) complacent in his duties as APA President, (4) interpreting the CBA (Section 11 D and Supplement F(1)) to the detriment of MDD pilots, (5) allowing the Dallas Grievance to sit stale for 5 years, and flip flopping on the membership status of MDD pilots to fit his current needs.

Wilson's declaration of March 8, 2016 is the first ever documentation by any APA or AA representative referencing a section of the CBA which purportedly allows terminations of disabled pilots. Wilson's reference to Section 1(C)(1) is an extremely far reach and almost a laughable attempt to support terminations. Section 1(C)(1) concerns "Scope" which relates to flying done by non-American Airlines companies on American's behalf. Section 21 **"Discipline, Grievances, Hearings, and Appeals"** of the CBA states reasons for termination, none of which call for terminating a disabled pilot.

American's Director Flight Administration, Scott Hansen, declaration of June 29, 2016 states: "American's routine business practice prior to 2013-2014 **was not** to provide notice to APA or a pilot when a pilot drops off the seniority list under Section 11(D)(1) or Supplement F of the CBA." Nor does American notify disabled pilots when they are "administratively terminated". Not only are American's business practices discriminatory against disabled pilots under the ADA, but they're also a violation of the CBA for not notifying pilots of a change in their status per Section 13(D) and Section 24(I) of the CBA (see SOF 14). APA did not uphold the provisions of the CBA and therefore did not fairly represent the MDD disabled pilots rights.

**CBA Section 11. D. 1 and Supplement F(1) do not call for the termination of pilots** "who have been on inactive status, unpaid sick, or disability for more than five years." **The CBA only states that seniority ceases to accrue** which results in removal from the seniority list, not termination. Over the past several years the APA has been complicit and complacent concerning American's termination of disabled pilots in violation of any provision of the CBA. For 5 years APA has not pursued a resolution to the Dallas grievance which was written on May 22, 2012 and in part states:

"..Company's [American Airlines] violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement [CBA] as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List **and** for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

APA most likely has not pursued the Dallas Grievance because it would be incriminating the APA for its own past practice of supporting such terminations which were done in complete cooperation with AA.   APA's silence is a DFR violation for not upholding the CBA provisions in support of disabled pilots and a possible violation of the ADA.

Captain McDaniels (past APA Membership Committee Chairman (2003-2010) and APA Board of Director (2010-2014)) made two declarations; (1) on July 8, 2013 during ED proceedings, and (2) November 19, 2015 during a federal lawsuit brought be a MDD pilots. The ED proceeding declaration to the arbitrator was worded in such a fashion to mislead the reader to believe that MDD pilots could be terminated per Section 11.D. and Supplement F of the CBA.  This muddied the waters in the eyes of the arbitrator and ultimately helped exclude 300 MDD pilots from full four silo ED funds.  The declaration wording to the Federal judge, November 19, 2015, left the impression that the disabled pilot was dropped from the seniority list in accordance with CBA Section 11(D)(1) but not terminated based on Section 11(D)(1).  Another example of the APA misleading the Arbitrator during ED proceedings into believing terminations were allowed under the CBA and then selectively not mentioning it to a Federal Judge when in fact APA knew such terminations are a DFR violation, CBA violation, and ADA violation.  See SOF 70.

The post-bankruptcy pilot seniority list integration of US Airways (East and West) and Legacy American Airlines concluded with the arbitrators September 2016 Decision and Award which included the Integrated Seniority List (ISL).  Noticeably **included ("Pulled and Plugged") in the ISL were eleven Legacy American Airlines MDD pilots while 300 similarly situated MDD pilots were absent**.

During the seniority list arbitration process multiple Legacy American MDD pilots informed all interested parties (AAPSIC, US Airways East and West seniority integration committees, American Airlines, the three Arbitrators, etc...) concerning errors contained in the AAPSIC

Certified List. These errors included, *inter alia,*: (1) inclusion of eleven MDD pilots who were "pulled and plugged" even though they exceeded five years of disability prior to the "Snapshot date" of December 9, 2013, (2) absence of pertinent information of approximately 250 similarly situated MDD pilot's including Preitz, and (3) pertinent information of pilots contained errors.

Multiple MDD pilots received no response from any of the interested parties. Preitz received a cosigned response from American Airlines and the APA President Keith Wilson. In part it read: "The parties did agree in the Protocol Agreement that **any claim** a pilot affected by the integrated seniority list may have **regarding the award** issued by the SLI arbitrators would be referred to the post-award dispute resolution process for review. Information about that process will be published when the award is issued." (SOF 116)

However the "dispute resolution process" published with the award stated that claims brought to the Dispute Resolution Committee (DRC) can only be brought by a pilot whose name **appears** on the ISL, by a group of pilots whose names **appear** on the ISL, or by a DRC member. This contradicts the April 18, 2016 AA/APA letter to Preitz which stated that "any claim a pilot affected but the integrated seniority list" would be referred to the post-award dispute resolution process. The dispute resolution process left no remedy for pilots who were left off the ISL.

The DRC is made up of three members: (1) Capt. Kelly Ison of US Airways East, (2) Capt. Russ Payne of US Airways West, and (3) Capt. Mark Stephens of the AAPSIC representing the APA pilots of legacy American Airlines. Capt. Stephens is the same person who was a lead member of the 2013 APA Equity Distribution Committee who tried to limit ED payouts to MDD pilots via discriminatory practices. He is also the AAPSIC committee chairman who supposedly exchanged the "AAPSIC certified list" with all interested parties, the same list that was supposedly "verified" but: (1) contained numerous errors, (2) included eleven MDD pilots who had exceeded five years on disability, and (3) excluded 250 similarly situated MDD pilots.

Preitz submitted a dispute, December 3, 2016, to the DRC and asked Captains Ison and Payne to: (1) champion the cause of the excluded 250 MDD pilots including Preitz, and (2) recuse or remove Capt. Stephens from the DRC due to his past poor history with MDD pilots and his

conflict of interest.  The DRC rejected Preitz' dispute on January 26, 2017 based on having no jurisdiction over Preitz's claim.  The DRC's rejection contradicts the AA/APA letter to Preitz dated April 18, 2016.   That letter stated that "**any claim** a pilot affected by the integrated seniority list" would be referred to the post-award dispute resolution process. Obviously Preitz was "affected by the integrated seniority list" but he was left with no process to be heard and protect his seniority.

Current APA President, Capt. Dan Carey, signed an October 2016 letter of agreement (LOA) with American Airlines.  According to the LOA American **will no longer remove MDD disabled pilots from the seniority list after exceeding five years on disability**.  American did not simply rollover and give away such an important concession to the APA outside of contract negotiations.  APA simply told American if they chose to continue the practice of terminating disabled pilots then American would do so on their own and that APA would no longer be complicit in such violations.  AA's CEO Doug Parker has a reputation for not changing contracts outside of negotiations, he changed the CBA (Sections 11 and Supplement F(1)) because he no longer had the APA support.  Doug Parker also cleaned house on American's Medical Department who was at the heart of American's fraudulent "nurse case manager cost savings" scheme that stripped disabled pilots of their rightful long term disability benefits.

October 2016s LOA created a "dough nut hole" of discrimination. No grandfather provision was included to protect prior MDD pilots negatively impacted by APA and American's past practice of violations.  Approximately 300 MDD pilots will not have their seniorities protected and will only be allowed to return to work by the good graces of American and the APA, something American has used as a punitive measure since November 2011 (SOF 124).  This "doughnut hole" has allowed the APA to keep 300 MDD pilots off the seniority list and rendered them ineligible for a full four silo Equity Distribution award.  APA's cost of placing the "300" on the seniority list would fall between **$15,000,000.00 to $30,000,000.00**, and expose the APA to admitting to the past poor judgement and decisions of its national officers, Board of Directors, committee members, and legal staff.  In December 2016 APA President Dan Carey fired the APA Director of Representation, Bennett Boggess.

MDD pilot Joe Barkate, by action of the October 2016 AA/APA, LOA was returned to the Integrated Seniority List (ISL).  Barkate is the first legacy American MDD pilot to be reinstated

to the ISL since the arbitrator's ISL award of September 2016. Barkate is: (1) a pilot who went on disability on or about September 15, 2008, (2) on or around September 15, 2013 Barkate was removed from the seniority list in accordance with CBA Section 11 (D) and Supp F(1), (3) Barkate was not included in the AAPSIC Certified List, (4) Barkate does not have an FAA First Class Medical Certification and has so stated, (5) it's unknown if Barkate received Equity Distribution funds during the 2013 ED process, (6) it's unknown if Barkate received Equity Distribution funds after he was reinstated to the ISL in October 2016,  and (7) Barkate is an APA insider and committee member (SOF 125).

Why is Barkate being treated differently than hundreds of other similarly situated MDD pilots who were not reinstated to the ISL and were also not on the seniority list as of December 9, 2013?  It appears to be blatant discrimination, DFR violation on the part of the APA, and a good old boy system gone wrong.

These intentional and constant discriminations against disabled pilots is a breach of the APA's duty of fair representation, breach of fiduciary responsibility, and most likely a violation of the American with Disabilities Act (ADA).  Many disabled pilots' careers and families have been irreparably hurt or destroyed at the hands of the APA.  Hundreds of pilots whose careers were cut short by APA's continual neglect and discrimination should be made whole at a minimum and be awarded punitive damages as well.  The pertinent sections of this claim should be handed over for EEOC investigation and violation of the ADA.

## COUNT V

## BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/BREACH OF FIDUCIARLY DUTY/VILOATION OF ADA

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that;

APA has not enforced the provisions of the Collective Bargaining Agreement as it pertains to loss of seniority of pilots who have been on inactive status, unpaid sick, or disability for more than five years.  These losses of seniority have been in disregard and violation of any provision

of the CBA, and are so noted by Captain Ed Sicher (APA Board of Director) in his email of August 20, 2016 to APA President Dan Carey.

American's Director Flight Administration, Scott Hansen, declaration of June 29, 2016 states:

> "American's routine business practice prior to 2013-2014 was not to provide notice to APA or a pilot when a pilot drops off the seniority list under Section 11(D)(1) or Supplement F of the CBA."

**CBA Section 11. D. 1 and Supplement F(1) do not call for the loss of seniority of pilots** `who have been on inactive status, unpaid sick, or disability for more than five years."` **The CBA only states that seniority ceases to accrue** which results in removal from the seniority list, not loss of seniority. Over the past several years, under then APA President Keith Wilson, the APA has been complicit and complacent concerning American's stripping of disabled pilot's seniority in violation of any provision of the CBA. For 5 years the APA has not pursued a resolution to the Dallas grievance which was written on May 22, 2012 and in part states:

> "..Company's [American Airlines] violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement [CBA] as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List **and** for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

Section 13(F)(1) "**Loss of Seniority**" of the CBA governs loss of seniority and states the only reasons for such loss ( SOF 63):

> "A pilot who *resigns* from the service of the Company, *retires*, or is *discharged for just cause*, shall forfeit *all* seniority as a pilot". Obviously a disabled pilot does not fall under any Section 13(F)(1) criteria; Jim Anderson agrees and stated so during his

deposition (SOF 63).  Anderson is American's Director of Crew Qualifications and charged with administering the CBA (see SOF 63).

The post-bankruptcy pilot seniority list integration of US Airways (East and West) and Legacy American Airlines concluded with the arbitrators September 2016 Decision and Award which included the Integrated Seniority List (ISL).  Noticeably **included ("Pulled and Plugged") in the ISL were eleven Legacy American Airlines MDD pilots while 300 similarly situated MDD pilots were absent**.

During the seniority list arbitration process multiple Legacy American MDD pilots informed all interested parties (AAPSIC, US Airways East and West seniority integration committees, American Airlines, the three Arbitrators, etc…) concerning errors contained in the AAPSIC Certified List.  These errors included, *inter alia*,: (1) inclusion of eleven MDD pilots who were "pulled and plugged" even though they exceeded five years of disability prior to the "Snapshot date" of December 9, 2013, (2) absence of pertinent information of approximately 250 similarly situated MDD pilot's including Preitz, and (3) pertinent information of pilots contained errors.

Multiple MDD pilots received no response from any of the interested parties.  Preitz received a cosigned response from American Airlines and the APA President Keith Wilson.  In part it read: "The parties did agree in the Protocol Agreement that **any claim** a pilot affected by the integrated seniority list may have **regarding the award** issued by the SLI arbitrators would be referred to the post-award dispute resolution process for review. Information about that process will be published when the award is issued." (SOF 116)

However the "dispute resolution process" published with the award stated that claims brought to the Dispute Resolution Committee (DRC) can only be brought by a pilot whose name **appears** on the ISL, by a group of pilots whose names **appear** on the ISL, or by a DRC member.  This contradicts the April 18, 2016 AA/APA letter to Preitz which stated that "any claim a pilot affected but the integrated seniority list" would be referred to the post-award dispute resolution process.  The dispute resolution process leaves little to no remedy for pilots who were left off the ISL.

The DRC is made up of three members: (1) Capt. Kelly Ison of US Airways East, (2) Capt. Russ Payne of US Airways West, and (3) Capt. Mark Stephens of the AAPSIC representing the APA pilots of legacy American Airlines. Capt. Stephens is the same person who was a lead member of the 2013 APA Equity Distribution Committee who tried to limit ED payouts to MDD pilots via discriminatory practices.  He is also the AAPSIC committee chairman who supposedly exchanged the "AAPSIC certified list" with all interested parties, the same list that was supposedly "verified" but: (1) contained numerous errors, (2) included eleven MDD pilots who had exceeded five years on disability, and (3) excluded 250 similarly situated MDD pilots.

Preitz submitted a dispute, December 3, 2016, to the DRC and asked Captains Ison and Payne to: (1) champion the cause of the excluded 250 MDD pilots including Preitz, and  (2) recuse or remove Capt. Stephens from the DRC due to his past poor history with MDD pilots and his conflict of interest.

Current APA President, Capt. Dan Carey, signed an October 2016 letter of agreement (LOA) with American Airlines.  According to the LOA American **will no longer remove MDD disabled pilots from the seniority list after exceeding five years on disability**.  American did not simply rollover and give away such an important concession to the APA outside of contract negotiations.  APA simply told American if they chose to continue the practice of terminating disabled pilots then American would do so on their own and that APA would no longer be complicit in such violations.  AA's CEO Doug Parker has a reputation for not changing contracts outside of negotiations, he changed the CBA (Sections 11 and Supplement F(1)) because he no longer had APAs support.  Doug Parker also cleaned house on American's Medical Department who was at the heart of American's fraudulent "nurse case manager cost savings" scheme that stripped disabled pilots of their rightful long term disability benefits.

October 2016s LOA created a "dough nut hole" of discrimination. No grandfather provision was included to protect prior MDD pilots negatively impacted by APA and American's past practice of violations.  Approximately 300 MDD pilots will not have their seniorities protected and will only be allowed to return to work by the good graces of American and the APA, something American has used as a punitive measure since November 2011 (SOF 124).  This "doughnut hole" has allowed the APA to keep 300 MDD pilots off the seniority list and rendered them ineligible for a full four silo Equity Distribution award.  APA's cost of placing the "300" on the

seniority list would fall between **$15,000,000.00 to $30,000,000.00**, and expose the APA to admitting to the past poor judgement and decisions of its national officers, Board of Directors, committee members, and legal staff.

AA/APA October 2016 LOA returned MDD pilot Joe Barkate to the Integrated Seniority List (ISL).  Barkate is the first legacy American MDD pilot to be reinstated to the ISL since the arbitrator's ISL award of September 2016.  Barkate is: (1) a pilot who went on disability on or about September 15, 2008, (2) on or around September 15, 2013 Barkate was removed from the seniority list in accordance with CBA Section 11 (D) and Supp F(1), (3) Barkate was not included in the AAPSIC Certified List, (4) Barkate does not have an FAA First Class Medical Certification and has so stated, (5) it's unknown if Barkate received  Equity Distribution funds during the 2013 ED process, (6) it's unknown if Barkate received Equity Distribution funds after he was reinstated to the ISL in October 2016,  and (7) Barkate is an APA insider and committee member (SOF 125).

Why is Barkate being treated differently than hundreds of other similarly situated MDD pilots who were not reinstated to the ISL and were also not on the seniority list as of December 9, 2013?  It appears to be blatant discrimination, DFR violation on the part of the APA, and a good old boy system gone wrong.

These intentional and blatant discrimination acts against disabled pilots are a DFR violation, breach of fiduciary responsibility, and most likely a violation of the American with Disabilities Act (ADA).  Hundreds of disabled pilots' careers and families have been irreparably hurt or destroyed by the intentional neglect and discrimination of the APA.  These victims of the APA should be made whole for careers cut short by APA's intentional neglect/discrimination and punitive damages awarded.  Pertinent portions of this complaint should be handed over for EEOC investigation of ADA violations.

# COUNT VI

# LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT (LMRDA) CIVIL ENFORCEMENT OF UNION MEMBER BILL OF RIGHTS, 29 .S.C. 411-412

Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that:

The Equity Distribution process concluded in November 2013 with Arbitrator Goldberg's Decision and Award. The 10 month Equity Distribution was a very adversarial process between APA and MDD pilots. A few MDD pilots prevailed in their ED challenges and won substantial payouts for themselves and similarly situated MDD pilots as a class. APA's Equity Distribution Post Hearing Brief stated that such a payout would "reduced the payout" to other APA pilot members (SOF 37). Code for we [APA] don't want none dues paying disabled members taking money from other pilots we have deemed to be recipients.

An APA member can access the APA membership website via login information, after logging in the pilot can navigate to the "Challenge and Response" (C&R) porthole. C&R is a virtual union meeting hall where pilots can share information back and forth with the other 15,000 pilot members of APA. It's the most expeditious, cost effective, and direct form of commination a single APA member can have with the entire 15,000 pilot **membership**. Other forms of APA communication limit contact to specific members/National Officers/Board of Directors and are not time or cost effective.

MDD pilots have enjoyed access to C&R since its creation 20 years ago (approximately early 1994) and were able to post and discuss topics on what the APA deemed to be a website to "... support the free and democratic discussion of issues between members of the Association."

During and following the ED process a few MDD pilots posted information concerning APA's treatment of disabled pilots and backed their positions with facts. April 2014, only four months

after the ED process concluded and APA had lost to MDD pilots, the APA locked out all MDD pilots (approximately 300) from the C&R portion of the membership website.   Preitz represents that APA's actions are in violation of the Labor Management Reporting and Disclosure Act (LMRDA).

Title I of the LMRDA; Bill of Rights of Labor Organizations, 29 U.S.C. 411, SEC. 101; provides among other things that every member of a labor organization shall have equal rights and privileges to participate in  union activities, freedom of speech and assembly in the union hall and protection or the right to sue.

Title I of the LMRDA; Bill of Rights of Members of Labor Organizations, 29 U.S.C. 412, SEC. 102. Civil Enforcement; provides, any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief, (including injunctions) as may be appropriate.

Preitz represents that APA's actions are in violation of the Labor Management Reporting and Disclosure Act (LMRDA) and occurred at a very critical time when the seniority list integration process was proceeding and the MDD pilot's seniority was in jeopardy.  MDD pilots were left without a critical pipeline of communication, Challenge and Response. One pilot's C&R LMRDA claim, prevailed in January 2017 in the Southern District of Florida (Kathy E. Emery v Allied Pilots Association, CASE NO. 14-80518-CIV-HURLEY). Judge Hurley found that the individual APA Board of Director's motivation for bringing the topic of MDD pilots, on C&R, to the Board of Directors was motivated by his desire to silence a group he viewed as combative and litigious.  The MDD pilots were left with no voice and completely in the dark from April 2014 till January 2017.  This was a crucial time in the MDD pilot's career because their seniority, and their future, was being mapped out without their knowledge.

Order APA to pay Preitz the cost and expenses of this litigation, including reasonable attorney's fee; and

Grant him punitive damages/career earnings as allowable and such further legal and equitable relief as the Court may deem just and proper.

Date:  March 10, 2017

WALLACE T. PREITZ II (Pro Se)
120 Suffield Court
Chalfont, PA 18914
Cell phone: 215-796-2499

## CERTIFICATE OF SERVICE

I, Wallace T. Preitz, Pro Se plaintiff, hereby certify that I have caused a true and correct copy of the foregoing claim to be served via certified mail and US mail, upon the following persons/parties on the date indicated below:

> Alexander Nemiroff [Pa Bar. No. 92250]
> One Commerce Square
> 2005 Market Street, Suite 2900
> Philadelphia, PA 19103
> (267) 602-2040
> Attorneys Defendant Allied Pilots Association

Date:   March 10, 2017

WALLACE T. PREITZ II (Pro Se)
120 Suffield Court
Chalfont, PA 18914
Cell phone: 215-796-2499