**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **WALLACE T. PREITZ, II,** | |
| *Plaintiff*, | **Civil Action** |
| *v.* | **No. 17-cv-1166** |
| **ALLIED PILOTS ASSOCIATION,** | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION**</u>

GOLDBERG, J.                                                  February 28, 2023

Plaintiff Wallace T. Preitz, a former American Airlines pilot, acting <u>pro se</u>, brings claims against Defendant Allied Pilots Association ("Allied") under the Railway Labor Act, 45 U.S.C. § 151 <u>et seq.</u>, and the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411. Allied is a labor union that represents pilots of American Airlines.

Plaintiff's claims stem from a long-running dispute over Allied's representation of pilots who were medically disqualified from flying. During the years underlying the facts of this case, American Airlines and Allied interpreted a provision of the applicable collective bargaining agreement as automatically terminating the employment of pilots, such as Plaintiff, who had been on disability leave for longer than five years, referring to such pilots "medically disabled dropped" ("MDD"). Plaintiff alleges that Allied unfairly denied him and other MDD pilots benefits to which they were entitled as union members and as parties to the collective bargaining agreement. Specifically, Plaintiff seeks compensation for being denied three benefits: (1) a full share of a payout from American Airlines' bankruptcy proceeding that was distributed to Defendants' members (the 2013 Equity Distribution); (2) protection of his place in American Airlines' seniority system

during his period of disability; and (3) a place in American Airlines' new seniority system following its merger with US Airways. In addition, Plaintiff seeks compensation under the Labor-Management Reporting and Disclosure Act for being denied access to Allied's online discussion forum.

Before me are cross-motions for summary judgment filed on behalf of both parties. For the reasons set out below, I conclude that the undisputed facts show that: (1) Plaintiff's claim with respect to his share of the 2013 Equity Distribution payout is time-barred; (2) Allied did not wrongfully fail to preserve Plaintiff's seniority because Plaintiff remained medically unable to resume flying until after he had agreed never to seek reemployment with American Airlines; and (3) Plaintiff was not harmed by being excluded from Allied's online forum because Plaintiff offers no evidence that he would have used the forum had the ban not been in effect.

I.    FACTUAL BACKGROUND

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). Each party here has moved for summary judgment. For clarity, and because Defendants motion will be granted and Plaintiff's motion denied, the facts below are presented in the light most favorable to Plaintiff.

A.    Plaintiff's Employment with American Airlines

Plaintiff began working for American Airlines in 1992 as a commercial airline pilot. (Answer ¶¶ 21, 23.) Plaintiff became a member of Defendant Allied Pilots Association, which is the labor organization that represents pilots of American Airlines. (Allied's Statement of Facts in Support of Summary Judgment ("Allied's Facts") ¶ 8.)

A seniority system governed pilots' employment at American Airlines. Plaintiff characterizes a pilot's position in the seniority list as "govern[ing] all aspects of the pilot's employment[]

and lifestyle" because a lower seniority number would give a pilot higher pay and a more flexible schedule. (Plaintiff's Brief at 1.) Although neither party offers evidence on the exact benefits of seniority, it appears undisputed that seniority was a highly coveted status among American Airlines pilots. The rules for accrual, retention, and loss of seniority were set out in a Collective Bargaining Agreement (CBA) between American Airlines and the pilots. (See CBA § 13.)

      B.    <u>"Medically Disabled Dropped" ("MDD") Pilots</u>

The focus of this case is how Allied treated pilots who had been on disability leave for longer than five years. Some background is needed to understand how the five-year mark became significant at American Airlines.

Federal regulations mandate that commercial airline pilots hold a valid medical certificate issued by the Federal Aviation Administration (FAA). 14 C.F.R. § 61.3(c). American Airlines required pilots medically disqualified from flying to take disability or sick leave. (See Allied's Facts ¶¶ 13-15.) The CBA contained provisions applicable to pilots on leave, including the following:

> 1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty. … Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years. …
>
> 2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by seniority upon return to active flying duty.

(CBA § 11.D (emphasis added).)

The bolded sentence above is the focus of the present lawsuit. During the facts underlying this case, Allied and American Airlines took the position that this sentence operated to automatically terminate the employment and seniority of any pilot on sickness or injury leave longer than

five years. Allied termed such pilots "medically disabled dropped" or "MDD." (Allied's Facts ¶ 33.) Plaintiff's lawsuit primarily concerns Allied's treatment of MDD pilots.

      C.    <u>Issues Involving MDD Pilots</u>

During the pertinent time frame underlying this case, several issues arose regarding the status of MDD pilots within American Airlines and Allied.

      1.    Continued Employment and Seniority

The first issue regarding MDD pilots was whether they were terminated and lost seniority or continued to be employees with retained seniority. As noted above, for an active pilot, seniority was a fundamental part of the job and a highly coveted status. But although the parties hotly dispute whether MDD pilots retained their seniority during their period of disability, neither party clarifies whether seniority conferred any benefit on pilots during the period in which they were disqualified from flying. However, it appears that the issue of whether MDD pilots retained seniority was important at least for deciding whether MDD pilots who regained their medical certificates could automatically return to their old positions in the seniority list, as opposed to requiring reinstatement.

The CBA does not say whether MDD pilots were still American Airlines employees or still on the seniority list. As Allied's Board member Ed Sicher explained, CBA § 11.D only states that leaves could not exceed five years—it does not say what would happen if a pilot tried to take a longer leave. (PREITZ2868; Sicher Tr., 1/6/21, at 99.) When a pilot crossed the five-year mark, "[h]e [went] into some type of area that we really [hadn't] defined clearly in the contract"—a "limbo land." (<u>Id.</u> at 99-100.) In short, the CBA does not say, one way or the other, whether MDD pilots were still employees or still on the seniority list.

Allied contends that CBA § 11.D operated to automatically terminate any pilot on leave for longer than five years, with that pilot being removed from American Airlines' seniority list. Plaintiff disagrees, and maintains that a violation of § 11.D's five-year cap did not result in termination. Plaintiff bases this interpretation on the fact that § 11.D does not mention termination, nor does any other part of the CBA state that a sickness or injury leave can be a basis for termination. Plaintiff also points out that CBA § 11.D says nothing about loss of seniority, and that under CBA § 13.C, a pilot who has accrued seniority will not lose it "except as provided" in CBA § 13, which lists the possible reasons for loss of seniority as resignation, retirement, discharge for "just cause," and failure to return from furlough. (CBA § 13.F.) Thus, in Plaintiff's view, passing the five-year mark for medical leave was not a permissible reason under the CBA for a pilot to be terminated or lose seniority.[1]

### 2.    Union Membership

A second issue that arose during the pertinent time period was to what extent MDD pilots remained members of Allied. This fact is relevant to Plaintiff's contention that Allied continued to have a duty to represent MDD pilots.

From roughly 2011 through 2016, the membership status of MDD pilots was a "gray area," and Plaintiff points to examples of Allied treating MDD pilots inconsistently with respect to union membership. (PREITZ2630.) Plaintiff and Allied now agree that MDD pilots were at the very least "inactive" members. (See Answer ¶ 239.)

---

[1] As noted, while the exact benefits of seniority are not fully explained, it appears undisputed that losing seniority would be a major setback for an American Airlines pilot.

### 3.    Restoration of Seniority

A third issue that arose was what should happen if an MDD pilot were to regain an FAA medical certificate and seek to resume flying for American Airlines. This issue was potentially important to Plaintiff as Plaintiff did eventually regain his own medical certificate in September 2016—although, for reasons described below, Plaintiff had by then agreed never to resume flying for American Airlines.

Allied now takes the position that an MDD pilot returning to active flying should have been restored to that pilot's "relative" position on the seniority list. Allied does not clarify what section of the CBA allegedly mandated that outcome. Under Plaintiff's interpretation of the CBA, of course, restoration of a pilot's place in the seniority list was unnecessary because MDD pilots were never removed from the seniority list in the first place.

Despite Allied's present position that MDD pilots should have had their relative seniority restored upon returning, Allied's position was less consistent during the pertinent time period. On November 4, 2006, Allied promulgated a resolution stating that restoring an MDD pilot's relative seniority would require an "exception" to the CBA. (PREITZ2538.) That resolution gave Allied's Board of Directors "final decision authority" to decide whether it would seek to have each MDD pilot's relative seniority restored, but the resolution did not state what criteria the Board would use in making that decision. In practice, of 55 MDD pilots who regained medical certificates and sought reinstatement, 52 were reinstated and 3 were not. (PREITZ4398-4400.)

### D.    Grievances Filed on Behalf of Returning MDD Pilots

Allied filed at least three grievances on behalf of MDD pilots who had regained their FAA medical certificates and were seeking to have their seniority restored. These grievances are important to Plaintiff's claims in this lawsuit for three reasons. First, Plaintiff uses these grievances

to rebut Allied's argument that MDD pilots were entitled to no representation. Second, Plaintiff contends that these grievances are examples of assistance that Allied gave to other MDD pilots but not to him, in what Plaintiff alleges was arbitrary or discriminatory treatment. Third, Plaintiff points to differences among how these three grievances were handled to argue that Allied advocated most zealously for favored "insider" pilots while offering only begrudging assistance to litigious "problem" pilots.

### 1.    The Dallas Grievance (Twitchell)

Dallas-based MDD pilot Andrea Susan Twitchell regained her FAA medical certificate, but American Airlines refused to reinstate her to the seniority list. (Plaintiff's Statement of Facts in Support of Summary Judgment ("Plaintiff's Facts") ¶¶ 171, 174; Preitz Tr. 82; PREITZ2144.) On May 22, 2012, Allied filed a "base grievance" on behalf of "all DFW [Dallas-Fort Worth]-based pilots." A "base grievance" (as opposed to an "individual grievance") usually involved practices that affected more than one pilot, could result in a precedential decision, and could be used by Allied to argue similar positions at other bases. (PREITZ2870; PREITZ689.) By contrast, an individual grievance would usually be resolved on a "no cite and no precedent basis." (PREITZ2870.) The Dallas base grievance protested:

> the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the [Collective Bargaining] Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

(APA317.)

The Dallas grievance was never arbitrated. (Answer ¶ 112.) Instead, Allied and American Airlines repeatedly agreed to hold the Dallas grievance "in abeyance" every sixty days, which is how it remained when Plaintiff brought this lawsuit. (See, e.g., APA318; Plaintiff's Facts ¶ 186;

Answer ¶ 112.) A member of Allied's Board of Directors testified that American Airlines did not want the Dallas grievance arbitrated because it could affect the reinstatement of "problematic pilots." (Plaintiff's Facts ¶ 355.)

### 2. The Chicago Grievance (Burns)

Chicago-based MDD pilot Taze Burns regained his FAA medical certificate in 2012. (Plaintiff's Facts ¶ 204; Allied's Facts ¶¶ 102-103.) American Airlines informed Burns that reinstatement to the seniority list was "by no means automatic" and no pilot had been reinstated since November 2011. (PREITZ3136.) American Airlines then denied Burns's reinstatement in August 2012. (PREITZ3130.)

On August 30, 2012, Allied filed a Chicago base grievance protesting the same practices as in the Dallas grievance. (APA153.) On February 6, 2013, American Airlines reinstated Burns to the seniority list, with Allied drafting a return-to-work letter stating that Burns was being permitted to return "on a no precedent exception basis." (Allied's Facts ¶ 106; Plaintiff's Facts ¶ 209.) Allied then withdrew the Chicago grievance. (Plaintiff's Facts ¶ 210.) American Airlines informed Burns that he was being reinstated because he was "'one of the good guys' and not taking advantage of disability." (Burns Declaration ¶ 23.)

### 3. The LaGuardia Grievance (Charlson)

MDD pilot Rodney Charlson, who was LaGuardia-based like Plaintiff, regained his FAA medical certificate in 2010. (Plaintiff's Facts ¶ 361.) On August 18, 2011, Allied filed a LaGuardia base grievance. (APA95.) Unlike the Dallas and Chicago grievances, the LaGuardia grievance protested only the failure to provide notice to MDD pilots before termination; it did not protest American Airlines' refusal to restore MDD pilots to the seniority list. (APA95.)

American Airlines and Allied held a hearing on the LaGuardia grievance on April 18, 2013, wherein the parties agreed to convert the base grievance to an individual grievance for Charlson only—despite the fact that an individual grievance would have been untimely when it was originally filed. (Plaintiff's Facts ¶ 223; APA4457; Allied's Facts ¶¶ 91, 97.) From 2006 to 2019, the LaGuardia grievance was the only base grievance Allied converted to an individual grievance, and Allied's Board member testified he had "never" seen a base grievance converted to an individual grievance. (PREITZ2870.) Charlson's individual grievance requested greater relief than the LaGuardia base grievance, as it requested that Charlson be reinstated to the seniority list. (Plaintiff's Facts ¶ 226.) Sometime in 2015, Charlson's individual grievance was resolved by a confidential settlement reinstating Charlson's seniority. (PREITZ246-47.)

E.    Plaintiff's Status as an MDD Pilot

In 2005, Plaintiff suffered a debilitating condition that resulted in him losing his FAA medical certificate. (Allied's Facts ¶ 10.) Plaintiff was first placed on long-term disability leave followed by unpaid sick leave. (Allied's Facts ¶¶ 13-15.) By 2010, Plaintiff still had not regained his FAA medical certificate, and his leave of absence passed the five-year mark. Allied designated Plaintiff MDD on or around June 2, 2010. (Plaintiff's Facts ¶ 15.)

The summary judgment record is unclear as to whether American Airlines terminated Plaintiff's employment or removed him from the seniority list. American Airlines' practice was not to notify employees if they were being removed under the company's interpretation of CBA § 11.D, and Allied similarly did not notify members if they had been designated MDD. (PREITZ1240; PREITZ234; PREITZ2668.) Plaintiff testified that he received conflicting information regarding whether he was still an employee: some American Airlines personnel told him

he had been "administratively separated," some told him told him he was in "limbo," and some told him he had not been terminated. (Preitz Tr. 38-41.)

In 2010, Plaintiff was told by an administrator of American Airlines' health plan that he had been terminated. (PREITZ129.) On April 17, 2013, Plaintiff emailed Allied to inquire about his employment status, and a committee member informed him that he was no longer employed by American Airlines and was no longer on the seniority list. (PREITZ2166-67.)

F.    Plaintiff's ERISA Lawsuit Against American Airlines

On November 12, 2007, American Airlines terminated Plaintiff's long-term disability benefits, and Plaintiff filed a lawsuit against American Airlines under the Employee Retirement Income Security Act (ERISA). Preitz v. American Airlines, Inc., No. 11-cv-44 (E.D. Pa.). (Plaintiff Declaration ¶ 10.)

Plaintiff's ERISA lawsuit is important to the facts that follow for two reasons. First, because Plaintiff's ERISA sought "reinstatement to seniority lists," it allowed him to argue that Allied should advocate for him the same way it advocated for other pilots who were seeking reinstatement. See No. 11-cv-44, Doc. No. 6. Second, Plaintiff ended up agreeing as part of his settlement with American Airlines that he would never seek reemployment with the company, a fact Allied points to in asserting that advocating for Plaintiff's reinstatement would have been futile.

G.    The 2013 Equity Distribution

One of Plaintiff's claims in this lawsuit is that he should have received a greater payout as part of a process that took place in 2013 called the 2013 Equity Distribution. The chronology of that process is as follows:

American Airlines filed for bankruptcy in November 2011. In exchange for releasing the company from certain obligations under the CBA, Allied received a share of stock to be distributed

among its members. The procedure for distributing funds was referred to as the Equity Distribution process. (Plaintiff's Facts ¶ 94.)

1.    Allied's Distribution Methodology

According to Allied's distribution methodology, funds were divided into four "silos" representing different interests impaired by American Airlines' bankruptcy. (Plaintiff's Facts ¶ 95; PREITZ9.) Those silos were:

1.    The "Inverse Seniority Silo," representing "financial harm from contractual changes that disproportionately affected junior pilots," (PREITZ9);

2.    The "Per Capita Silo," representing "financial harm from contractual changes that tend[ed] to affect all pilots equally," (Id.);

3.    The "Years of Service Silo," representing financial harm that disproportionately affected pilots with more years of service, (PREITZ9-10); and

4.    The "Pension Silo," representing "financial harm resulting from the 'freeze' of the pilots' defined benefit pension plan," (PREITZ10.)

Pilots who were active on January 1, 2013 would be eligible to receive a payout from all four silos. (Plaintiff's Facts ¶ 96.) Pilots who had been terminated for cause but had a pending grievance for reinstatement ("Terminated Awaiting Grievance" or "TAG" pilots) were treated as active pilots and would receive a payout from all four silos, under the assumption that many of those grievances would succeed. (See PREITZ64, 69.) Pilots on long-term disability more than five years were eligible to receive a payout from some but not all silos—based on Allied's understanding that CBA § 11.D removed such pilots from the seniority list. (PREITZ64; Plaintiff's Facts ¶ 113.) MDD pilots not on long-term disability, such as Plaintiff, would receive no payout. (PREITZ64; Plaintiff's Facts ¶ 117.)

2.      Plaintiff's Challenge to the Distribution Methodology

Allied created a dispute resolution process for pilots to challenge the Equity Distribution methodology before an arbitrator. (Plaintiff's Facts ¶¶ 95, 98.) Plaintiff and other MDD pilots challenged Allied's decision to award them no share of the payout. Plaintiff focused on the difference in the way Allied's distribution methodology treated TAG pilots who were challenging termination "for cause" and the way it treated pilots with other pending disputes, such as Plaintiff's ERISA lawsuit, that could result in reinstatement. (See PREITZ129-30.) Plaintiff also argued that he should be treated as a TAG pilot because the Dallas grievance discussed above applied to him, even though he was a LaGuardia-based pilot. (Plaintiff's Facts ¶ 122.) Alternatively, Plaintiff asked that he be treated as a pilot who remained on long-term disability for longer than five years because the termination of his long-term disability benefits allegedly violated ERISA. (PREITZ131-32.)

Allied first responded to Plaintiff's challenge by pointing out that Plaintiff had been terminated from American Airlines and was no longer on the seniority list. Thus, according to Allied, Plaintiff was owed no duty of representation and thus had no right to invoke the arbitration process. (Plaintiff's Facts ¶ 109.) The arbitrator rejected that argument, finding that Plaintiff's ERISA suit could result in reinstatement and Plaintiff therefore had "standing" to argue that he should be treated like TAG pilots. (PREITZ2375-76.)

Allied next argued that "[Plaintiff's] [ERISA] lawsuit, even if successful, [did] not and could not seek to return him to active flying; it [sought] only to reinstate his LTD benefits." (PREITZ197.) In Plaintiff's view, this was a misrepresentation, as Plaintiff's ERISA complaint did seek restoration of seniority.

Allied also told the arbitrator that the Dallas grievance would not result in any pilot who did not have a current FAA medical certificate being reinstated to the seniority list. (PREITZ177.)

Allied relied on an affidavit by its attorney, Bennett Boggess, stating that the Dallas grievance "is not seeking to reinstate all pilots who have dropped off the seniority list by function of Section 11 or Supplement F" and that it only sought to "improve the process for reinstatement of pilots who have their First Class Medical certification and are ready to return to active status." (Boggess Affidavit ¶ 11.) Allied also noted that opening the Equity Distribution pool to all 300 MDD pilots would dilute payouts to non-MDD pilots who were more affected by American Airlines' bankruptcy. (PREITZ194.)

### 3.    The Arbitrator's Decision

In a written opinion, the Equity Distribution arbitrator awarded Plaintiff some but not all of the relief he sought. The arbitrator wrote that Plaintiff had been "dropped from the seniority list" (apparently accepting Allied's interpretation of CBA § 11.D) but that Plaintiff had a pending ERISA suit "seeking reinstatement of his LTD benefits and reinstatement to the seniority list." (PREITZ68.) The arbitrator then decided that Allied acted "arbitrarily" by assuming that TAG pilots would succeed in their grievances but not likewise assuming that Plaintiff's ERISA suit would succeed in restoring his long-term disability benefits. (PREITZ69.) The arbitrator therefore decided that Plaintiff should be treated as a pilot on long-term disability who had been on disability longer than five years, entitling him to a distribution from three of four silos.

For unexplained reasons, the arbitrator did not discuss Plaintiff's contention that his ERISA suit should be assumed successful in its entirety such that Plaintiff should be treated as a pilot on active status and receive a four-silo payout. Instead, the arbitrator simply commented that because Plaintiff received the three-silo payout owed pilots on long-term disability, there was "no reason to comment on [Plaintiff's] other arguments." (PREITZ70.)

By contrast, another MDD pilot who challenged Allied's distribution methodology before the arbitrator did receive a four-silo payout. Lawrence Meadows became disabled in 2004 and, like Plaintiff, did not possess an FAA medical certificate at the time of the Equity Distribution process. (PREITZ65; Answer ¶ 141.) In 2012, Meadows filed a grievance claiming that the real reason American Airlines removed him from the seniority list was retaliation for a 2011 lawsuit Meadows filed against American Airlines. (PREITZ65.) Unlike with Plaintiff, the arbitrator took into account that Meadows's grievance, if successful, would result in reinstatement, and consequently treated Meadows as an active pilot entitled to a four-silo payout. (PREITZ66.)

One month after the arbitrator's decision, Plaintiff sought reconsideration on the ground that the arbitrator treated him differently than Meadows. (Plaintiff's Facts ¶ 145.) The arbitrator denied Plaintiff's request on November 15, 2013 but did not explain why Plaintiff and Meadows were treated differently. (Plaintiff's Facts ¶ 145.)

Years later, on August 22, 2016, Plaintiff asked the Equity Distribution arbitrator to reconsider his decision a second time. (PREITZ1190-1211.) Plaintiff's renewed challenge argued that: (1) Allied withheld evidence and misrepresented facts during the Equity Distribution process; (2) Plaintiff had found new evidence; and (3) Allied applied the arbitrator's decision inconsistently. (PREITZ1191.) The misrepresented facts consisted of Allied's statement to the arbitrator that Plaintiff's ERISA suit sought only reinstatement of disability benefits and not seniority reinstatement. (PREITZ1193.) Plaintiff also contended Allied should have informed the arbitrator about the existence of the LaGuardia grievance—as Plaintiff was a LaGuardia-based pilot—and that Allied should have acknowledged that success in the Dallas grievance would have benefited non-Dallas-based pilots. (PREITZ1195.) Plaintiff's purportedly newly discovered evidence included an acknowledgment by a member of Allied that Plaintiff's ERISA suit could achieve seniority

reinstatement. (PREITZ1208.) On October 21, 2016, the arbitrator determined that he did not have jurisdiction to resolve Plaintiff's challenge and denied it for that reason. (PREITZ1309.)

4.    Payouts to Other MDD Pilots

Following the Equity Distribution arbitrator's decision, Allied awarded payouts to other MDD pilots who had not raised challenges before the arbitrator. These payouts are relevant because different MDD pilots received different amounts and Plaintiff therefore offers them in support of his contention that Allied used favoritism in how it treated MDD pilots.

One MDD pilot to receive a payout despite not participating in the Equity Distribution process was Rodney Charlson, the subject of the LaGuardia grievance discussed previously. As of January 1, 2013 (the date for determining active status), Charlson had not returned to employment and had been on leave for more than five years, but had regained his FAA medical certificate and was the subject of the pending LaGuardia grievance. (See supra § I.D.3.) Allied awarded Charlson four silos, purportedly based on its conclusion that the pending LaGuardia base grievance was a grievance on behalf of Charlson seeking seniority reinstatement—even though seniority reinstatement was not mentioned in the language of the grievance. (PREITZ270-71.) No other pilot received four silos based on the LaGuardia grievance. (PREITZ3152.)

Another MDD pilot to receive a payout was Twitchell, the subject of the Dallas grievance (also discussed previously), who also did not file a challenge in the Equity Distribution process. (PREITZ708.) Allied determined that Twitchell had a pending ERISA suit that should be presumed successful, thus entitling her to some payout. (PREITZ709.) But unlike with Charlson, Allied did not consider Twitchell to have a pending grievance seeking seniority reinstatement—even though Twitchell was the subject of the pending Dallas grievance and even though the Dallas grievance, unlike the LaGuardia grievance, did protest American Airlines' practice of "failing to

reinstate" MDD pilots to the seniority list. (PREITZ713; supra § I.D.1.) Allied awarded Twitchell only two silos, but does not explain why Twitchell was treated differently than Charlson. (PREITZ709.)

### H.   Plaintiff's June 2013 Request for a Grievance

When Plaintiff learned that Allied did not plan to treat him as a TAG pilot, he contacted union representatives at LaGuardia and asked them to confirm that the Dallas base grievance applied to him, or, alternatively, to file a new grievance on his behalf. (PREITZ2543.) Plaintiff asked for his grievance to use language identical to that contained in the Dallas grievance because it would help his position in the Equity Distribution process that he should be treated as a TAG pilot. (PREITZ2542, PREITZ2123.)

In June 2013, Plaintiff called an attorney for Allied to request that a grievance be filed on his behalf. (PREITZ2123.) Then, in July 2013, Plaintiff's own attorney wrote to Allied's attorney to request a grievance. (Id.) Allied never filed a grievance on Plaintiff's behalf. (Plaintiff Declaration ¶ 25; Allied's Facts ¶ 157.)

### I.   The 2016 Seniority Integration Process

As part of American Airlines' bankruptcy restructuring, the company was merged with US Airways to form a new entity also called American Airlines. (Myers Affidavit ¶¶ 16-17.) Allied became the union for the new company. (Allied's Facts ¶ 112.) Pursuant to the McCaskill Bond statute, the new American Airlines was required to merge the seniority lists of its predecessors. (Myers Affidavit ¶¶ 41-42.)

The 2016 seniority integration process is important to Plaintiff's claims in three ways. First, one of Plaintiff's claims is that he was unfairly excluded from that process and therefore did not receive a place on the integrated seniority list. Second, Plaintiff complains of Allied's even more

favorable treatment of MDD pilot Barkate, who was allowed to return to his pre-disability seniority status even though he, like Plaintiff, was not included on the integrated seniority list. Third, Plaintiff argues that Allied made certain statements during the seniority integration process that revealed Allied's arguments to the Equity Distribution arbitrator in 2013 to be misrepresentations.

### 1. Seniority Integration Procedure

Some background on the procedure used to integrate the pre-merger seniority lists is necessary to understand how Plaintiff claims he was excluded from that process. Representatives of the predecessor entities (American Airlines and the two divisions of US Airways) and their respective unions, including Allied, established a procedure for merging their respective seniority lists before a panel of arbitrators. (Allied's Facts ¶¶ 111, 115.) Pilots from the predecessor airlines were represented by committees called "Merger Committees," with Allied's Merger Committee being called the "American Airlines Pilots Seniority Integration Committee" ("AAPSIC"). (Allied's Facts ¶ 116; Plaintiff's Facts ¶ 256.)[2]

Under the protocol, the Merger Committees submitted employment data, including pre-merger seniority lists, to the arbitration panel. The submissions were required to include "information for any pilot who has been terminated or otherwise removed from the pre-merger seniority list[] whose status is the subject of any pending litigation or dispute." (Plaintiff's Facts ¶ 260.) The "snapshot date" for determining pre-merger seniority was December 9, 2013. (PREITZ746.)

---

[2] The parties dispute whether AAPSIC was part of Allied or a separate entity, which is relevant to Allied's argument that it cannot be held liable for AAPSIC's conduct. Because it is unnecessary to resolve this dispute, the below facts are presented as if AAPSIC was a committee within Allied, as Plaintiff contends it was.

2.     Omission of Plaintiff and Subsequent Correction

When AAPSIC provided its information to the arbitration panel, Plaintiff's name was not included. (Allied's Facts ¶¶ 124-125; Plaintiff's Facts ¶ 261.) Plaintiff wrote to Allied on February 25, 2016 that, under the protocol, his name should be listed because he had a pending ERISA lawsuit seeking reinstatement. (PREITZ738-740.) Plaintiff then relayed those same concerns to AAPSIC's chair and other individuals. (Plaintiff's Facts ¶ 262.)

On March 6, 2016, AAPSIC's chair confirmed Plaintiff's observation that Plaintiff's information was not included in the data AAPSIC sent to the arbitration panel. (PREITZ746.) The chair then stated that "[u]pon review of your letter and the status of your lawsuit, we are notifying the parties and arbitrators that your name should be added to those of the pilots identified in the AAPSIC list as a pilot whose seniority status is the subject of any pending litigation or dispute." (Id.) The chair also stated that, if Plaintiff were to succeed in his ERISA suit or regain his FAA medical certificate, his "position on the integrated seniority list [would] be determined consistent with the legal ruling or settlement, [Allied's] constitution and bylaws, the collective bargaining agreement, any seniority integration dispute resolution procedure, and applicable union and company policy." (Id.)

That same day, AAPSIC's chair emailed the arbitrators to notify them that Plaintiff "has a pending ERISA lawsuit that could potentially impact his prior removal from the seniority list after more than five years in a disability status." The email included Plaintiff's information, and concluded with: "We do not believe this addition has any material impact on any matter currently being considered by the arbitration panel but does ensure AAPSIC compliance with the protocol regarding updates of certified lists for accuracy." (PREITZ747-48.) Plaintiff contends that AAPSIC's acknowledgment that Plaintiff's ERISA lawsuit could have resulted in reinstatement was inconsistent with the position Allied took before the 2013 Equity Distribution arbitrator.

On March 9, 2016, Plaintiff wrote directly to the arbitration panel concerning what Plaintiff viewed as additional errors in the data provided by AAPSIC. Plaintiff complained that AAPSIC's data included 11 MDD pilots who were not on the seniority list even though it omitted Plaintiff. (Plaintiff's Facts ¶¶ 264, 275; Preitz Declaration ¶ 53.)[3] The arbitration panel did not respond. (Preitz Declaration ¶ 153.)

On April 4, 2016, Plaintiff initiated a grievance alleging that the seniority integration process treated long-term disabled pilots unfairly. (PREITZ773-76.) On April 18, 2016, Plaintiff received a response from Allied's President and American Airlines' Managing Director of Labor Relations stating that the dispute resolution process Plaintiff was attempting to invoke "did not create … an avenue for pilots to lodge collateral attacks on the [seniority list integration] process itself" but that "any claim a pilot affected by the integrated seniority list may have regarding the award issued by the [seniority list integration] arbitrators would be referred to the post-award dispute resolution process for review." (PREITZ741.)

3.      Outcome

The arbitration panel published the integrated seniority list in September 2016. The 11 MDD pilots from AAPSIC's data were on the list, but Plaintiff was not. (Plaintiff's Facts ¶ 276.) Allied contends, based only on an affidavit from its attorney, that those 11 pilots were included in error and "scrubbed" from the seniority list before the list was put into effect at the post-merger American Airlines. (Myers Affidavit ¶ 51.)

---

[3] Allied responds to this and other paragraphs in Plaintiff's Statement of Facts with a boilerplate objection that does not address the substance of Plaintiff's contention or cite contrary evidence. "If a party fails … to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other remedies, "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Because Plaintiff's Statement of Fact No. 264 is supported by an appropriate citation to evidence and Allied cites no contrary evidence, I will treat it as true for purposes of resolving the present motions for summary judgment.

After the arbitration panel published the integrated seniority list, Plaintiff attempted to in-voke the "post-award dispute resolution process" that Allied's President had directed him to ear-lier. Plaintiff submitted a grievance to a "Dispute Resolution Committee" complaining that 11 MDD pilots, but not him, were on the integrated seniority list despite that he had a pending ERISA suit seeking reinstatement. (Plaintiff's Facts ¶ 296; APA4444-45; PREITZ1318-25.) On January 26, 2017, the Dispute Resolution Committee responded that it could not consider Plaintiff's chal-lenge because it did not concern the "interpretation or application" of the arbitrators' decision; rather, Plaintiff was challenging the decision itself. (APA7152.) The Dispute Resolution Commit-tee informed Plaintiff that the arbitrators had been "on notice" that Plaintiff had a pending chal-lenge to his removal from the seniority list, and further stated that "[w]hen and if you attain the appropriate qualifications and return to flying at [American Airlines], you may be reinstated to the appropriate place on the [seniority list] in accordance with the Arbitrators' Final Award and [American Airlines']/[Allied's] policy and procedure." (Id.)

J.    Plaintiff's Settlement with American Airlines

In June 2016 (midway through the seniority integration process), Plaintiff settled his ERISA lawsuit with American Airlines. (PREITZ2589.) As part of the settlement, Plaintiff agreed that he would not seek reemployment with American Airlines. (PREITZ2595.) The agreement further provided that if a distribution of settlement funds were not made to Plaintiff "following the end of the fourth quarter of 2016, [Plaintiff] may, at his option, declare [the] agreement null and void … ." (PREITZ2591.) Settlement funds were not disbursed to Plaintiff until September 2017. (PREITZ2843.)

K.    Restoration of Plaintiff's Medical Certificate

Plaintiff regained his FAA medical certificate in September 2016. (Plaintiff's Facts ¶ 353.)

L.    Barkate's Reinstatement

Joseph Barkate was an American Airlines pilot and Allied member who lost his FAA med-ical certificate in 2008, becoming MDD five years later on October 3, 2013. (Allied's Facts ¶ 146.) When the seniority integration process took place in 2016, Barkate had been MDD prior to the snapshot date of December 9, 2013, and therefore was not placed on the integrated seniority list. (Plaintiff's Facts ¶ 312.)

In the summer of 2016, Barkate called Allied's lawyer to discuss possibly regaining his FAA medical certificate. (Barkate Tr. 42-43.) Allied informed Barkate that American Airlines did not want to reinstate him. (Id.) As a result, Barkate did not pursue his FAA medical certificate because regaining it would cause him to lose disability benefits. (Id. at 62-63.)

In October 2016, Allied and American Airlines discussed Barkate's "status," and a member of Allied's Board of Directors subsequently wrote in an email on October 19, 2016 that American Airlines agreed to "allow[] one MDD pilot [i.e., Barkate] back on the seniority list." (PREITZ3089-90; PREITZ1960.) In December 2016, Barkate heard from Allied's President that he would be reinstated. (Barkate Tr. 43.) At the time, Barkate still did not have an FAA medical certificate. (Allied's Facts ¶ 148.)

Barkate did not start the process of regaining his FAA medical certificate until after he heard he was "cleared to go" (thus preserving his disability benefits as long as possible). (Barkate Tr. 43.) In August 2019, Barkate regained his FAA medical certificate and was reinstated. (Allied's Facts ¶¶ 148, 155.) Barkate later came to understand that he was allowed to return when other pilots were denied because the 2016 agreement between Allied and American Airlines gave him a "trump card." (Barkate Tr. 77-78.) Barkate had volunteered for several of Allied's committees, and, unlike Plaintiff, Barkate never sued Allied or American Airlines. (PREITZ3072, 3076, 3079.)

In March 2017, a member of Allied's Board of Directors told MDD pilot Lawrence Meadows that Barkate was treated favorably because Barkate did not sue Allied. (PREITZ2055-56.)

    M.    <u>Post-September 2016 Changes in the Status of MDD Pilots</u>

After September 2016, Allied made two policy changes that reflected a more positive view of the status of MDD pilots than Allied had taken in the past. These changes are relevant to this case for two reasons. First, Plaintiff offers these changes to corroborate his position that MDD pilots were always entitled to have Allied represent them. Second, Plaintiff argues that Allied should have made these changes sooner—or applied them retroactively—so that he could have benefited from them. As it stood, because Plaintiff agreed in June 2016 not to seek reemployment with American Airlines and was no longer MDD by September 2016, these prospective-only changes conferred no benefit on Plaintiff.

The first change was that, on October 19, 2016, Allied and American Airlines agreed that disabled pilots would no longer be removed from the seniority list after being on leave for five years—essentially, that no new pilots would be designated MDD. (PREITZ1966.) The agreement was prospective-only: it would not result in the reinstatement of any pilot (such as Plaintiff) previously removed from the seniority list after five years of disability. (<u>Id.</u>)

The second change was that in December 2016, Allied's Board of Directors passed a resolution to seek "the immediate reinstatement and return to the Pilot System Seniority List" of all MDD pilots. (PREITZ2327-28.) That resolution further stated that "there has been some evidence indicating that [American Airlines] has unfairly withheld reinstatement to long-term disabled pilots who have regained their Class A medicals … if they were considered problematic employees." (<u>Id.</u>) Allied decided to make this change because it realized that its former interpretation of § 11.D gave American Airlines an excuse to deny reinstatement to "problematic" pilots—i.e., those who

had sued the company. (Sicher Tr., 1/6/21, at 96, 101-02.) But Allied ultimately failed to imple-
ment its new resolution to reinstate MDD pilots because members of Allied who were not on the
Board felt that MDD pilots were not owed a duty of representation and therefore should not be
reinstated. (Id. at 247-48.)

N.    "Challenge and Response"

As noted, in addition to Plaintiff's claims that Allied failed to advocate for him and protect
his seniority, Plaintiff seeks damages under the Labor-Management Reporting and Disclosure Act
(LMDRA) for being excluded from Allied's online forum, which was called "Challenge & Re-
sponse." (Plaintiff's Facts ¶ 320.) Beginning in April 2014, MDD pilots were denied access to
Challenge & Response. (Plaintiff's Facts ¶ 323.) On January 4, 2017, a judge of the United States
District Court for the Southern District of Florida found that Allied violated § 101(a)(2) of the
LMDRA by "silenc[ing] criticism of the union's management by a discreet minority of disabled
members" and ordered Allied to restore access for the plaintiff in that case, Kathy Emery. Emery
v. Allied Pilots Ass'n, 227 F. Supp. 3d 1292, 1302 (S.D. Fla. 2017). Allied subsequently restored
access for all MDD pilots. (Plaintiff's Facts ¶ 341.)

Allied does not challenge the court's finding in Emery that exclusion of MDD pilots from
the forum was wrongful, and argues only that Plaintiff is not entitled to damages because Plaintiff
would not have used the forum had the ban not been in effect.

II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a ver-
dict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case

under governing law. <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. <u>Galena v. Leone</u>, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. <u>Schaar v. Lehigh Valley Health Servs., Inc.</u>, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing <u>Williams v. Borough of W. Chester, Pa.</u>, 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial <u>Celotex</u> burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." <u>Id.</u> at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

III.   <u>DISCUSSION</u>

    A.   <u>Duty of Fair Representation Claim</u>

Under the Railway Labor Act, a union has "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." <u>Air Line Pilots Association, Int'l. v. O'Neill</u>, 499 U.S. 65, 74 (1991). "Although originally passed to regulate conduct in the railroad industry, the Act has been extended to encompass 'common carriers by air' … ." <u>Capraro v. United Parcel Service Co.</u>, 993 F.2d 328, 331 n.4 (3d Cir. 1993). "The duty of fair representation is … akin to the duty owed by other fiduciaries to their beneficiaries." <u>O'Neill</u>, 499 U.S. at 74.

Plaintiff contends Allied breached its duty of fair representation to him in three ways: (1) by not awarding him the payout he was entitled to in the 2013 Equity Distribution; (2) by not protecting his place on the seniority list during his period of disability; and (3) by not including him on the 2016 integrated seniority list. Allied disputes that it breached its duty. Allied also contends that Plaintiff's claims should be dismissed as time-barred and because Plaintiff was not a member of the relevant "bargaining unit."

For the reasons explained below, I find that Plaintiff could convince a factfinder that he was a member of Allied's bargaining unit and that his claims with respect to loss of seniority are timely. However, I ultimately conclude that Plaintiff cannot show that Allied breached a duty to protect his seniority because at all relevant times, Plaintiff was either medically disqualified from flying or had agreed never to seek reemployment with American Airlines.

    1.   Statute of Limitations

"[T]he statute of limitations for a duty of fair representation claim against a union under the [Railway Labor Act] is six months." <u>Bensel v. Allied Pilots Association</u>, 387 F.3d 298, 304

(3d Cir. 2004). "As a general matter, a duty of fair representation claim accrues and the six month limitations period commences when the futility of further union appeals becomes apparent or should have become apparent." Id. at 305 (quotation marks omitted). "If, however, a union purports to continue to represent an employee in pursuing relief, the employee's duty of fair representation claim against the union will not accrue so long as the union proffers 'rays of hope' that the union can remedy the cause of the employee's dissatisfaction." Id. (quotation marks omitted). "[I]f there is a material issue of fact about when the statute of limitations period began to accrue, then … granting of summary judgment [is] improper." Id. at 304.

Plaintiff filed this lawsuit on August 29, 2016. Any events that occurred before February 29, 2016 predate the limitations period. Only a handful of the events underlying this case took place after that date: the seniority integration process, Plaintiff's settlement of his ERISA lawsuit, Plaintiff's second request for the Equity Distribution arbitrator to reconsider his decision, and the negotiation between Allied and American Airlines concerning the reinstatement of Barkate. Based on these facts, Plaintiff argues that the rays-of-hope doctrine entitles him to bring claims for events as far back as the 2013 Equity Distribution. I analyze each of Plaintiff's claims under this doctrine.

### a) Plaintiff's Claim with Respect to the 2013 Equity Distribution

I find that the undisputed facts show that Plaintiff's claim with respect to the 2013 Equity Distribution is time-barred. The Equity Distribution process took place in 2013, with the arbitrator's decision being rendered on October 15, 2013. The arbitrator denied Plaintiff's first motion for reconsideration on November 15, 2013. All of these events occurred long before the limitations period. Plaintiff has not pointed to any facts from which it could be inferred that Allied offered "rays of hope" that it might change its stance on Plaintiff's Equity Distribution payout. In fact, all indications were that Allied remained flatly opposed to awarding Plaintiff more than three silos.

Plaintiff argues that Allied offered "rays of hope" because, in August 2016, he asked the Equity Distribution arbitrator to reconsider a second time. But this doctrine looks to whether the union, not the plaintiff, offered "rays of hope." See Bensel, 387 F.3d at 305. Plaintiff's belief that he could seek a second reconsideration in August 2016 does not change the fact that Allied never suggested the issue was anything but settled. Accordingly, Plaintiff's claim relating to his 2013 Equity Distribution payout is time-barred.

### b)   Plaintiff's Claim for Failing to Protect His Seniority While Disabled

I reach a different conclusion as to Plaintiff's claim that Allied failed to protect his seniority during his period of disability. Plaintiff's disability did not end until he regained his medical certificate in September 2016, and Allied took actions through 2016 that could have led Plaintiff to believe that loss of seniority was not a foregone conclusion.

First, Allied kept the Dallas grievance open from 2013 through the initiation of this lawsuit. While the Dallas grievance did not by its terms include Plaintiff, it advocated an interpretation of CBA § 11.D consistent with Plaintiff's view that MDD pilots did not automatically lose seniority. Thus, a factfinder could conclude that Allied offered "rays of hope" that it would similarly advocate for Plaintiff when his medical certificate was restored.

Second, Allied maintained an ambiguous position on whether MDD pilots who regained FAA medical certificates should be reinstated. Allied's written policies stated that the Board would vote on each member's request but provided no standard to guide the Board's decision. As late as December 2016, Allied was considering negotiating for the reinstatement of all MDD pilots. (PREITZ2327-28.) Because Plaintiff did not regain his FAA medical certificate and thus was not in a position to seek reinstatement until September 2016, Plaintiff had no way of knowing whether Allied would advocate on his behalf. When Plaintiff raised concerns in the seniority integration

process, he was told that his "position on the integrated seniority list [would] be determined consistent with the legal ruling or settlement, [Allied's] constitution and bylaws, the collective bargaining agreement, any seniority integration dispute resolution procedure, and applicable union and company policy." (PREITZ746.)

Based on these facts, and viewing them in the light most favorable to Plaintiff, a factfinder could determine that Plaintiff was justifiably hopeful that the issue of his seniority was not yet resolved against him.

c)   <u>Plaintiff's Seniority Integration Claim</u>

Lastly, Plaintiff's claim with respect to Allied's failure to include him in the integrated seniority list is timely because all events underlying this claim occurred within the limitations period.

2.   Membership in the "Bargaining Unit"

A second threshold consideration under the duty of fair representation analysis is whether Plaintiff was a member of Allied's "bargaining unit." <u>Bensel</u>, 387 F.3d at 312. "The scope of the duty of fair representation is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent." <u>Id.</u> "[T]he union's statutory duty of fair representation does not extend to those persons who are not members of the pertinent bargaining unit." <u>Id.</u>

Allied argues that MDD pilots were not members of its bargaining unit because they were automatically terminated from employment with American Airlines. But Allied offers no documentation defining the scope of its bargaining unit during 2011 through 2016 and merely asserts that nonemployees were not members.

Plaintiff counters with examples in which Allied advocated on behalf of terminated MDD pilots, such as Twitchell, Burns, Charlson, and Barkate. Plaintiff argues that MDD pilots must

28

have been part of the bargaining unit or Allied would not have filed these grievances. Plaintiff further reasons that since one purpose of a labor union is to protect employees who may have been wrongfully terminated, it would make little sense to hold that an employee is automatically excluded from representation the moment the employer decides to terminate their employment. See Peterson v. Lehigh Valley District Council, 676 F.2d 81, 87 (3d Cir. 1982) (union has a duty to represent employee seeking reinstatement). Furthermore, Plaintiff points out that the Equity Distribution arbitrator found that Plaintiff was owed a duty of representation as a pilot grieving his termination, and Allied has not repudiated that decision. For these reasons, a factfinder could infer that terminated MDD pilots, including Plaintiff, were members of the bargaining unit.

### 3. Contours of the Duty

I next turn to whether Plaintiff can show a factual dispute regarding whether Allied breached its duty of fair representation. "A breach of the statutory duty of fair representation occurs … when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967). Those terms are defined as follows:

Conduct is "arbitrary" when it is "irrational" or "without a rational basis or explanation." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 46 (1998). "[T]his involves more than demonstrating mere errors in judgment." Hines v. Anchor Motor Freight, Inc, 424 U.S. 554, 571 (1976). "Any substantive examination of a union's performance … must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." O'Neill, 499 U.S. at 78. "[T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' … that it is wholly 'irrational' or 'arbitrary.'" Id.

Conduct is "discriminatory" when it treats members differently based on "capricious or arbitrary factors." <u>Humphrey v. Moore</u>, 375 U.S. 335, 350 (1964). But equal treatment of all members is not required:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

<u>Ford Motor Co. v. Huffman</u>, 345 U.S. 330, 338 (1953). Despite this wide latitude, a union may breach its duty of fair representation when it makes distinctions among members "solely for the benefit of a stronger, more politically favored group over a minority group." <u>Barton Brands, Ltd. v. NLRB</u>, 529 F.2d 793, 798 (7th Cir. 1976) (alterations and quotation marks omitted). "[T]he Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority." <u>Id.</u> at 800. In particular, "[d]isputes involving both a union official and a union member may give rise to a tension between the union's loyalty to its officials and its duty to rank-and-file members. … [T]his possible conflict of interest places an additional responsibility on the union to assure that it handles its members' grievances fairly." <u>Tenorio v. NLRB</u>, 680 F.2d 598, 602 (9th Cir. 1982).

Finally, a union acts in "bad faith" "when it acts with an improper intent, purpose, or motive. … Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." <u>Spellacy v. Airline Pilots Ass'n Int'l</u>, 156 F.3d 120, 126 (2d Cir. 1998).

Plaintiff has the burden of establishing that Allied breached its duty of fair representation. <u>See</u> <u>Humphrey</u>, 375 U.S. at 351 (entering judgment for defendant because plaintiff "ha[d] not … proved his case"). Proof requires more than "idle speculation to assume that the result would have been different had the matter been differently presented." <u>Id.</u>

       4.       Whether Allied Engaged in Arbitrary, Discriminatory, or Bad Faith
               Conduct

For the reasons set out below, I conclude that Plaintiff has not pointed to sufficient evidence upon which a factfinder could conclude that that Allied's conduct, with respect to claims that are not time-barred, was arbitrary, discriminatory, or in bad faith. Although there may be evidence that Allied treated some MDD pilots inconsistently in that it favored reinstating union "insiders" over "problematic" pilots, ultimately, none of these actions affected Plaintiff because he did not become medically eligible to resume flying until after he had agreed never to return to employment with American Airlines.

I begin by noting that Allied's treatment of certain other MDD pilots could be viewed as inconsistent or influenced by favoritism. For instance, Plaintiff has pointed to the following evidence:

– First, Allied may have favored some pilots over others when it secured reinstatement for Burns, Charlson, and Barkate but dragged its feet with Twitchell. Twitchell regained her medical certificate and Allied nominally filed a grievance on her behalf but indefinitely postponed that grievance such that Twitchell received no benefit. Of the 55 MDD pilots who sought reinstatement, the only three who did not receive it were pilots who had sued either Allied or American Airlines. (Plaintiff's Facts ¶ 319.) And Allied's Board member essentially admitted that Barkate was reinstated because he did not sue Allied. (PREITZ2055-56.)

– Second, Allied may also have used favoritism in handing out Equity Distribution payments, although Plaintiff's claim with respect to his own Equity Distribution payment is time-barred. Allied gave Charlson a higher Equity Distribution payout than Twitchell despite Twitchell arguably having a stronger claim to one because her Dallas grievance included a reinstatement request that was missing from Charlson's LaGuardia grievance. Moreover, Charlson and Plaintiff were both subject to the LaGuardia base grievance and Charlson had not been reinstated as of the snapshot date used in the Equity Distribution process, but Allied for some reason gave Charlson a higher payout than Plaintiff.

– Finally, Allied may have avoided creating precedent on the reinstatement rights of MDD pilots, leaving the decision to its sole discretion. A member of Allied's Board of Directors noted that the Dallas grievance, which was held indefinitely in abeyance, could affect the reinstatement of "problematic pilots." (Plaintiff's Facts ¶ 355.) Allied's decision to convert the LaGuardia base grievance to an individual grievance was also apparently unusual, in that it was the only base grievance Allied converted to an individual grievance. And it

might be inferred from the timing that Allied's conversion of the LaGuardia grievance had something to do with preventing MDD pilots from using it to claim shares of the 2013 Equity Distribution.

But even accepting Plaintiff's claims regarding Defendant's treatment of other MDD pilots who regained their medical certificates and sought reinstatement, there are no facts to establish that this conduct affected Plaintiff. Allied's challenged actions were directed at other pilots and not at Plaintiff. See Vaca, 386 U.S. at 190 ("A breach of the statutory duty of fair representation occurs only when a union's conduct <u>toward a member</u> of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." (emphasis added)). "Plaintiff[] must … demonstrate a causal connection between the union's wrongful conduct and [his] injuries." Spellacy, 156 F.3d at 126. It is undisputed that before September 2016, Plaintiff did not possess an FAA medical certificate, and after June 2016, Plaintiff had agreed with American Airlines that he would never seek reemployment. For that reason, Allied's interactions with other pilots is of no moment, and no amount of advocacy on Allied's part could have returned Plaintiff to active flying with American Airlines.

I have carefully considered Plaintiff's three responses in support of his position that Allied's actions affected him personally. But for the following reasons, I find each unpersuasive.

a)   <u>Reinstatement Without a Medical Certificate</u>

Plaintiff first appears to argue that Allied should have advocated for American Airlines to reinstate him to the seniority list prior to June 2016 even though Plaintiff was not eligible to fly. Plaintiff asked for such a grievance to be filed in June 2013 (to help him with his Equity Distribution challenge) and similarly tried to be included on the integrated seniority list in the spring of 2016 even though he did not possess a medical certificate until September 2016. Plaintiff argues Allied arbitrarily deprived him of this benefit.

Although Plaintiff and Allied agree that a pilot without an FAA medical certificate was not "qualified to fly for American Airlines" and that American Airlines would have required such a pilot to take leave, Allied does not assert that such a pilot would be barred from being "reinstated" in some, perhaps nominal, sense. (Allied's Facts ¶¶ 13-15.) But Plaintiff has not explained how reinstatement to the seniority list with no ability to fly would have benefited him—other than by entitling him to an increased payout in the 2013 Equity Distribution, which is time-barred. While early inclusion on the seniority list might have smoothed Plaintiff's transition to reemployment had he regained his medical certificate before contractually barring himself from seeking reemployment, that benefit is speculative because it hinges on actions Plaintiff never took: Plaintiff did not regain his medical certificate at a time when he was still contractually permitted to fly for American Airlines, and he did not attempt to fly for American Airlines once he obtained his medical certificate. Plaintiff suggests no other way that being on the seniority list but without a medical certificate would have helped him.

I also conclude that there are insufficient facts to establish that Allied owed a duty to MDD pilots to seek their reinstatement prior to their regaining medical certificates. As to discrimination, Plaintiff lacks evidence that Allied ever filed a grievance challenging American Airlines' application of CBA § 11.D to a pilot who did not yet have a medical certificate. Allied did file a grievance on behalf of Meadows in 2012 even though Meadows did not then have a medical certificate, but Meadows's grievance did not argue that American Airlines misapplied CBA § 11.D; it argued that American Airlines retaliated against Meadows over his ERISA suit. Allied also provided assistance to Barkate before Barkate obtained a medical certificate, which is discussed in more detail in the next section, but that assistance did not include filing a grievance. Therefore, the undisputed

facts show that Plaintiff was not treated differently than other pilots in terms of when grievances were filed.

I also conclude that Plaintiff has failed to raise a dispute of fact that the practice of waiting for a pilot to regain a medical certificate before filing a grievance challenging the application of CBA § 11.D was arbitrary. To show arbitrariness, Plaintiff would need evidence that this practice was "so far outside a 'wide range of reasonableness' … that it [was] wholly 'irrational' or 'arbitrary.'" O'Neill, 499 U.S. at 78. Although the summary judgment record is somewhat unclear as to why Allied did not challenge the application of CBA § 11.D to pilots who were not yet able to fly, Plaintiff's evidence does not rise to the level of showing that Allied's strategy was irrational or arbitrary. Plaintiff's evidence could show, at most, that Allied was mistaken to accept an interpretation of CBA § 11.D under which pilots' seniority was automatically terminated after five years of disability because this gave American Airlines opportunities to deny reinstatement to pilots considered "problematic." But given that it is undisputed that MDD pilots could not resume flying until they regained their medical certificates, Plaintiff cannot show that Allied's interpretation of CBA § 11.D was not a "rational basis or explanation" for Allied to require a medical certificate before filing a grievance seeking a pilot's reinstatement.

Plaintiff also contends that Allied acted arbitrarily or discriminated against him when it included 11 MDD pilots other than himself on the integrated seniority list. Allied takes the position that those 11 MDD pilots were included by mistake and that mere negligence does not breach the duty of fair representation. See Danao v. ABM Janitorial Services, 142 F. Supp. 3d 363, 372 (E.D. Pa. 2015). Although Allied's support for this factual contention is thin and consists of only an affidavit by Allied's own attorney, it is Plaintiff who bears the burden of proof. See Humphrey,

375 U.S. at 351. Plaintiff has not offered evidence that those 11 names were included for a more nefarious reason.

In short, Plaintiff has failed to offer evidence sufficient to convince a factfinder that Allied's discriminatory, arbitrary, or bad faith conduct caused him not to be reinstated to the seniority list before he was eligible to fly in September 2016.

### b)   Security of Future Reinstatement

Plaintiff next argues that Allied should have provided him security that he would be reinstated in the future. Plaintiff contends that if he were confident that he could be reinstated upon regaining his medical certificate, he could have negotiated a more favorable settlement with American Airlines. Plaintiff thus characterizes his agreement not to seek reemployment with American Airlines as a product of Allied's own misconduct, which forced him to accept a settlement on less favorable terms. Cf. Plantation Bay, LLC v. Stewart Title Guarantee Co., No. 15-cv-2042, 2016 WL 4508228, at *5 (D.N.J. Aug. 29, 2016) (viewing settlement with a third party as mitigation of damages for a defendant's breach of duty).

Plaintiff offers two ways Allied could have secured his future reinstatement. First, as with Barkate, Plaintiff posits that Allied could have negotiated a promise that Plaintiff would be reinstated after obtaining an FAA medical certificate. While Allied responds that Barkate did not technically return to the seniority list before becoming eligible to fly in 2019, there is evidence that Allied obtained an agreement that Barkate would return in the future, and I must accept this fact is true at the summary judgment stage. Plaintiff also contends that Allied could have arbitrated the Dallas, Chicago, and LaGuardia grievances to create precedent on the rights of MDD pilots. While Allied views the Dallas, Chicago, and LaGuardia grievances as irrelevant because those grievances would not have resulted in MDD pilots being reinstated, that point is at least disputed: the Dallas

and Chicago grievances included reinstatement language and the Chicago and LaGuardia griev-

ances actually achieved pilots' reinstatement. Allied also argues that these grievances did not "ap-

ply" to Plaintiff, but Plaintiff's point is that Allied <u>could</u> have applied these grievances to him as

they challenged the same interpretation of CBA § 11.D that American Airlines had used to justify

Plaintiff's removal from the seniority list. Thus, this is sufficient evidence to convince a factfinder

that Allied could have taken actions that would have given Plaintiff greater confidence that he

would be reinstated in the future if and when he regained his medical certificate.

But Plaintiff ultimately lacks sufficient facts that security of future reinstatement, either

through a promise as was offered to Barkate or through precedent from arbitration of a grievance,

would have benefited his negotiations with American Airlines. No evidence has been offered as to

how Allied's conduct influenced the terms of that settlement. While Plaintiff may be correct in the

abstract that Allied's breach of its duty could influence Plaintiff's negotiating position, Plaintiff's

claim cannot be supported by "idle speculation … that the result would have been different had

the matter been differently presented." <u>Humphrey</u>, 375 U.S. at 351.

The connection between the Dallas, Chicago, and LaGuardia grievances and Plaintiff's

ERISA settlement is especially remote and therefore cannot support Plaintiff's breach-of-duty

claim. To conclude that Plaintiff would have benefited from a resolution of those grievances, a

factfinder would have to speculate how an arbitrator would have resolved those grievances, what

that arbitral decision would have been based on, how that precedent would have impacted a hypo-

thetical, post-September 2016 grievance seeking Plaintiff's reinstatement, and what impact Plain-

tiff's ability to bring such a hypothetical grievance would have on his negotiation in an unrelated

ERISA lawsuit.

In particular with respect to Barkate, Plaintiff also does not offer evidence that Allied would have denied Plaintiff the same assistance had Plaintiff made a similar inquiry regarding future reinstatement. Barkate informed Allied of his plan to regain an FAA medical certificate and asked whether American Airlines would reemploy him. When the response from American Airlines came back negative, Allied negotiated a promise that Barkate would be reinstated upon regaining his medical certificate. By contrast, there is no evidence that Plaintiff planned to regain his medical certificate before June 2016 or informed Allied of such a plan. There is also no evidence that Plaintiff asked Allied what would happen were he to regain his medical certificate or of how Allied would have responded to such an inquiry. These facts are entirely speculative.

Plaintiff has thus not raised a genuine dispute of fact as to whether Allied breached its duty to him by failing to secure his future reinstatement or failing to arbitrate base grievances with respect to other MDD pilots.

c)   <u>Rescinding the Settlement Agreement</u>

Plaintiff's final argument in opposition to summary judgment is that even though he agreed never to seek reemployment with American Airlines, he could have rescinded that agreement based on the clause permitting him to treat the agreement as void if settlement funds were not disbursed on time. Specifically, per that clause, Plaintiff apparently had a right to rescind the agreement between January 1, 2017 (the deadline for disbursing funds) and September 2017 (when funds were actually disbursed), during which time Plaintiff possessed an FAA medical certificate. (PREITZ2591; PREITZ2843.) Allied concedes that Plaintiff had the right to rescind the settlement agreement. (Allied's Facts ¶ 22.)

The problem with this argument is that Plaintiff did not ask Allied to file a grievance for his reinstatement between January 1, 2017 and September 2017, nor did he inquire whether Allied

would do so. Accordingly, it is entirely unknown whether Allied would have refused such a request and would have allegedly breached its duty had the request been made.

Plaintiff contends a request for reinstatement would have been futile because he was not on the integrated seniority list. (Plaintiff's Reply at 8.) But there are two problems with that argument. First, the pilot Plaintiff claims received more favorable treatment, Barkate, was also not on the integrated seniority list, so Plaintiff was not treated differently in that regard. Second, Allied informed Plaintiff on January 26, 2017 that "[w]hen and if you attain the appropriate qualifications and return to flying at [American Airlines], you may be reinstated to the appropriate place on the [integrated seniority list] in accordance with the Arbitrators' Final Award and [American Airlines']/[Allied's] policy and procedure," not that Allied would refuse to seek his reinstatement.[4] (APA7152.) Plaintiff therefore does not have evidence that it would have been futile to ask Allied between January and September 2017 whether it would be willing to seek his reinstatement were he to rescind the settlement agreement.

Plaintiff alternatively argues that Allied should have included him on the integrated seniority list so that he would have had an automatic right to resume flying had he rescinded his settlement agreement on January 1, 2017 (a benefit not even Barkate received). But Plaintiff's only argument that excluding him from the integrated seniority list was wrongful is that 11 other MDD pilots were included, and there is no evidence that those 11 pilots were included for an improper reason.

---

[4] It is unclear whether the individual who made this statement was aware that Plaintiff was by then already qualified to fly.

For these reasons, Plaintiff has failed to raise a genuine dispute of fact as to whether Allied engaged in arbitrary, discriminatory, or bad faith conduct that caused harm to him personally. Plaintiff's duty of fair representation claim must therefore be dismissed.

B.    LMDRA ("Challenge & Response") Claim

Plaintiff seeks damages for the time he and other MDD pilots were excluded from the online forum Challenge & Response from 2014 to 2017. Allied does not dispute the court's finding in Emery v. Allied Pilots Ass'n, 227 F. Supp. 3d 1292 (S.D. Fla. 2017), that it violated the LMDRA by excluding MDD pilots. Instead, Allied argues Plaintiff is not entitled to damages on this claim because Plaintiff has no evidence he would have used Challenge & Response had the ban not been in effect.

In response, Plaintiff does not contend that he would have used Challenge & Response during 2014 through 2017. Plaintiff also does not suggest another way that the ban harmed him. A federal court lacks jurisdiction to award damages to a plaintiff who was not injured by the defendant's conduct. TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021). That remains true even if the defendant acted illegally. Id. at 2205. Because Plaintiff has not offered evidence that Allied's violation of the LMDRA injured him, I will grant summary judgment to Allied on Plaintiff's LMDRA claim.

IV.    CONCLUSION

For the reasons set out above, I will grant Allied's motion for summary judgment, deny Plaintiff's motion for summary judgment, and enter judgment for Allied.